## MATTER OF JEROME NAWROCKI

[No. 563, September Term, 1971.]

*Decided April 25, 1972.*

254

The cause was argued before ANDERSON, MORTON and ORTH, JJ.

*Peter J. Karceski, Jr.,* for appellant.

*Emory Alvin Plitt, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Lawrence Isbee, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The keystone of this case is the determination by the judge presiding in the division for juvenile causes of the Circuit Court of Baltimore City (juvenile court) that WALTER JEROME NAWROCKI was a delinquent child by reason of his delinquent act in committing the crime of disorderly conduct.[1] Our inquiry turns first, therefore, to the crime of disorderly conduct, and then to the sufficiency of the evidence adduced to prove that Nawrocki was guilty of that offense.

I

The Court of Appeals pointed out in *Drews v. State,* 224 Md. 186[2] at 192 that although it is said that there was no common law crime of disorderly conduct, nevertheless it was a crime at common law to do many of the

---

* Note: *Certiorari* denied, Court of Appeals of Maryland, June 29, 1972.

1. " 'Delinquent Child' means a child who commits a delinquent act and who requires supervision, treatment, or rehabilitation." Code, Art. 26, § 70-1 (h). " 'Delinquent Act' means * * * an act which would be a crime if done by a person who is not a child." Id., at § 70-1 (g).

In the Eighth Judicial Circuit, consisting of Baltimore City, a division of the Circuit Court of Baltimore City known as the division for juvenile causes has exclusive original jurisdiction over children alleged to be delinquent. Id., § 51 (a) and § 70-2 (a) (1).

2. See also *Drews v. State,* 236 Md. 349. Unless otherwise indicated reference to the *Drews* case in this opinion shall be to that reported in 224 Md. 186.

things that constitute disorderly conduct under present day statutes. There are three statutes in this State making various acts of a disorderly nature a criminal offense—§§ 121, 122 and 123 of Art. 27 of the Code. We look at such of the provisions of them as may be relevant to the matter at hand.

Section 121 makes it a crime for any person "wilfully [to] disturb any neighborhood" in any city, town or county of this State "by loud and unseemly noises, or profanely [to] curse or swear * * * upon or near to any [public street or highway in any such city, town or county] within the hearing of persons passing by or along such highway * * *."

Section 122 makes it a crime for any person to act "in a disorderly manner to the disturbance of the public peace," or "wilfully [to] act in a disorderly manner by making loud and unseemly noises or by profanely cursing, swearing or using obscene language * * * on or about any public place * * *."

Section 123 (c) makes it a crime for any person to "act in a disorderly manner to the disturbance of the public peace, upon any street, highway, alley, park or parking lot, or in any vehicle that is in or upon any street, highway, alley, park or parking lot, in any city, town, or county in this State * * *."[3]

The terms employed by the statutes are not defined therein, so we consider them in their common meaning. "Loud" is "characterized by high volume and intensity of sound * * * clamorous and insistent." "Unseemly" and its synonyms such as "improper", "indecorous", "indelicate" mean "in violation of accepted standards of what is right or proper." Within the contemplation of the statutes, "curse" and "swear" are synonymous—"to use profane oaths", "abuse profanely", "to invoke evil, calam-

3. See ch. 666, Acts 1968, effective 1 July 1968 which rewrote § 123 formerly consisting of one paragraph composed of four sentences. See also ch. 146, Acts 1968, also effective 1 July 1968 and ch. 282, Acts 1969, effective 1 July 1969. Neither the rewriting of the statute nor the amendments made any substantive change in the provision with which we are concerned.

ity, or injury upon", "to damn." Although a synonym for "profane" is "blasphemous", it is better here considered in its secular sense of being "abusive, vulgar, or irreverent language." [4] See *State v. West*, 9 Md. App. 270.

Interpreting the statutes, by the express provisions of § 121, other persons must be within hearing of the disturbing noises. So a person standing on a county highway making loud and unseemly noises and profanely cursing and swearing would not be committing the crime proscribed by § 121 unless within the hearing of others passing by or along the highway. We do not believe it necessary that the State prove such other persons in fact heard the noises; it would be sufficient if they were passing by or along the highway so that reasonably they may have heard them.

We next look at § 123 because we think the judicial construction given subsection (c) thereof with which we are here concerned,[5] is germane to an interpretation of § 122. Section 123 prohibits acting "in a disorderly manner to the disturbance of the public peace" in certain public places.[6] The Court of Appeals in *Drews v. State*, *supra* at 192 discussed the nature of disorderly conduct under § 123 (see note 3 *supra*). It said:

> "The gist of the crime of disorderly conduct under Sec. 123 of Art. 27, as it was in the cases of common law predecessor crimes, is the doing or saying, or both, of that which offends, dis-

---

4. The meanings above set out are from the American Heritage Dictionary of the English Language.

Blackstone listed "profane and common swearing and cursing" as an offense against religion. 4 *Commentaries on the Laws of England*, 59-60.

5. Subsections (a) and (b) deal with intoxication and intoxicating beverages.

6. Expressly, "upon any public street, highway, alley, park or parking lot, or in any vehicle that is in or upon any street, highway, alley, park or parking lot, in any city, town, or county in this State, or at any place of public worship, or public resort or amusement in any city, town or county of this State, or in any store during business hours, or in any elevator, lobby or corridor of any office building or apartment house having more than three separate dwelling units in any city, town or county of this State."

turbs, incites, or tends to incite, a number of people gathered in the same area. 3 Underhill, *Criminal Evidence,* Sec. 850 (5th Ed.), adopts as one definition of the crime the statement that it is conduct 'of such a nature as to affect the peace and quiet of persons who may witness the same and who may be disturbed or provoked to resentment thereby.' "

It pointed out that it was a crime at common law to make loud noises so as to disturb the peace of the neighborhood, to collect a crowd in a public place by means of loud or unseemly noises or language, or to disturb a meeting assembled for religious worship or any other lawful purpose. And it noted that it has been held that failure to obey a policeman's command to move on when not to do so may endanger the public peace is within the contemplation of disorderly conduct. We think it patent that disorderly conduct within the contemplation of *Drews* requires the actual presence of other persons who "may witness" the conduct or hear the language and who "may be disturbed or provoked to resentment thereby." The *Underhill* quotation was simply authority for the statement as to the gist of the offense set out immediately before—that the conduct or language offends, disturbs, incites or tends to incite "a number of people gathered in the same area." Such construction is consistent with our opinions in *Luthardt v. State,* 6 Md. App. 251 and *Streeter v. State,* 5 Md. App. 435. In *Heinze v. Murphy,* 180 Md. 423, the Court held that an arrest and charge of disorderly conduct were not justified by evidence that the arrestee used profane language on the lawn of his home and refused to give an officer information regarding an automobile accident where there was no evidence that the language was heard by any person other than the officer or beyond the premises. At 428-429. Cf. *Sharpe v. State,* 231 Md. 401, in which Marbury, J. filed a dissenting opinion concurred in by Brune, C. J. and Hammond, J., and Hammond J. filed a concurring dissent in which Brune, C. J. concurred.

Section 122 proscribes two general courses of conduct on or about any public place. The first, "acting in a disorderly manner to the disturbance of the public peace" may be committed silently as by one indecently exposing his person, explicitly prohibited, or by failing to obey a lawful order of the police, such as a command to move on, when not to do so may endanger the public peace, implicitly prohibited by judicial construction of comparable provisions in *Drews, supra*. The second, as does § 121 explicitly and § 123 implicitly, contemplates noises made, either loud and unseemly, or by profanely cursing, swearing or using obscene language. Prior to the enactment of ch. 520, Acts 1967, the two courses of conduct applied to persons "on or about any steamboat wharf, dock or public waiting room, or in or about the station grounds of any railroad in the State, or in or about any steamboat, streetcar, electric car, railroad car, passenger train or other public conveyance." The 1967 amendment made the section applicable to public places generally by inserting the phrase "any public place" immediately preceding the other places designated. So we have no difficulty whatsoever in finding that the legislative intent was directed toward conduct which tended to disturb the public peace. Section 122 appears under the subtitle "Disturbance of the Public Peace"; its first proscription is disorderly conduct "to the disturbance of the public peace"; its other proscriptions designate places where the public is entitled to be and normally would be, and patently are intended to run to the benefit of the public. We feel that the section contemplates the actual presence of other persons who may be affected by the conduct or language proscribed, and that the construction given § 123 (c) is apposite to § 122.

Although the constitutionality of the statutes is not here challenged, the application of certain facets of them have constitutional connotations. The statutes punish spoken words, but they cannot apply to speech, although vulgar or offensive, that is protected by the First and Fourteenth Amendments. *Terminiello v. Chicago*, 337 U.

S. 1, 4-5. The Court said in *Gooding v. Wilson*, 405 U. S. 518, 10 Cr. L. 3137 at 3138:

> "The constitutional guarantees of freedom of speech forbid the States from punishing the use of words or language not within 'narrowly limited classes of speech.' *Chaplinsky v. New Hampshire*, 315 U. S. 568, 571 (1942). Even as to such a class, however, because 'the line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn,' *Speiser v. Randall*, 357 U. S. 513, 525 (1958), '[i]n every case the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom,' *Cantwell v. Connecticut*, 310 U. S. 296, 304 (1940)."

The State has the power to punish obscene expression, but to be obscene such expression must be, in some significant way, erotic, so as to conjure up such psychic stimulation in anyone likely to be confronted with it. *Cohen v. California*, 91 S. Ct. 1780, 1785. And the State is free to ban the simple use, "without a demonstration of additional justifying circumstances, of so-called 'fighting words,' those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." Ibid, quoting *Chaplinsky v. New Hampshire*, 315 U. S. 568. So a statute must be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression. Only the courts of a State can supply the requisite construction of its State's statutes; the Supreme Court lacks "jurisdiction authoritatively to construe state legislation." *United States v. Thirty-Seven Photographs*, 402 U. S. 363, 369. We deem the language prohibitions of the statutes here considered, as construed by *Drews*, to embrace only unprotected speech and not to apply to protected expression. The short of it is that

the "obscene language" prohibited by the statute means obscene in the constitutional sense. The "profanely cursing [or] swearing" prohibited by the statutes and the "saying" aspect of the gist of the crime of disorderly conduct as set out in *Drews,* mean "fighting" words. *Gooding* gives us guidance with respect to "fighting" words by quoting with approval the discussion of them by the Supreme Court of New Hampshire in the *Chaplinsky* case:

> "* * * ['fighting' words] have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed * * * The test is what men of common intelligence would understand would be words likely to cause an average addressee to fight * * * Derisive and annoying words can be taken as coming within the purview of the statute [proscribing offensive, derisive and annoying words] * * * only when they have the characteristic of plainly tending to excite the addressee to a breach of the peace * * * The statute, as construed, does no more than prohibit the face-to-face words plainly likely to cause a breach of the peace by the addressee * * *." 91 N. H. 310, 313, 320-321, 18 A. 2d 754, 758 762 (1941).

We note that whether the "loud and unseemly noises" prohibitions of the statutes are within the ambit of protected expression depends on the nature and content of them, a question to be determined on the facts of the particular case.

## II

The petition filed against Nawrocki, born 25 January 1955, alleged that he was delinquent:

> "For the reason that on July 4th, 1971, 0355 hrs in the City aforesaid Jerry Walter Nawrocki charged with Disorderly Conduct by using pro-

fane language and threatening a prisoner and failing to obey a lawful order. This offense occurred 2327 Essex Street.

Jerry Walter Nawrocki unlawfully did Resist the arrest of one Officer Raymond Smith by jumping out of the cruiser and running. He was caught by Officer Allen Brenton. This offense occurred in the 2400 block Fait Avenue."

The evidence before the juvenile court at the time the court made its decision on the merits was scant. Officer Raymond Smith of the Baltimore City Police Department testified that on 4 July 1971 about 3:40 a.m. he was in front of 2327 Essex Street "returning a juvenile home for his parents to sign a custody release report." The juvenile prisoner was still in the police cruiser when Nawrocki, known to the officer only as "Dog", "came over * * * and started an argument with the suspect I had in my car, began using profane language and threatened the suspect I had in my custody. * * * He was going to work him over and do him in and everything right down the line * * * was going to get even with him." Smith testified: "I got out of the car to place him under arrest for being disorderly. He took off running." On cross-examination Smith made clear that "When I got to the point where I heard [Nawrocki] threaten my prisoner and using profane language * * * I was going to place him under arrest." It was as the Officer was getting out of the cruiser to do so that Nawrocki fled. "I was going to get out of the car to place him under arrest for disorderly conduct." This was the extent of the evidence adduced pertinent to the offense of disorderly conduct.

Smith further testified that after Nawrocki fled he released his juvenile prisoner ("the people had him sign off") and cruised in the immediate area. He received certain information and returned to 2327 Essex Street. He saw Nawrocki standing in front of the premises, "his right hand shoved down inside his pants waistband as if holding something. * * * I pulled up to the curb and ordered him to stop, and he took off running. He ran

east in the 2300 block of Essex Street, north on Montford Avenue, and east again in the 2400 block of Foster Avenue where he was stopped. He was placed under arrest and put in the cruiser." A back-up cruiser responded to the scene ("a man alleged to be armed" call had been put over the police radio) and as it pulled up Nawrocki jumped out of Smith's cruiser and attempted to flee. The officer in the back-up cruiser stopped him and he was taken to the Southeast Police Station.

The allegation of resisting arrest in the petition could have no direct bearing on the question of Nawrocki's delinquency. If the evidence was sufficient to show that Nawrocki was guilty of the crime of disorderly conduct, this alone would support the finding of delinquency whether or not he resisted the arrest. But if the evidence was not sufficient to establish that Nawrocki was guilty of the crime of disorderly conduct, then he would not be guilty of the offense of resisting arrest because his arrest would be illegal.

"A refusal to submit to lawful arrest and resistance to an officer of the law in the performance of his duties constitutes an offense at common law * * *, and is an offense in this State." *Preston v. Warden,* 225 Md. 628. See *Lyles v. State,* 10 Md. App. 265, 268; *McGee v. State,* 1 Md. App. 239, 241; Perkins, *Criminal Law* (2d Ed., 1969) 494-496; 4 Wharton's *Criminal Procedure* (Anderson) § 1617. In the 1957 edition of Perkins *Criminal Law* it is stated at 424:

> "One is privileged to use reasonable force to prevent the unlawful deprivation of his liberty. * * * Since he is in no way interfering with any *lawful* activity of the officer he is not guilty of obstructing justice even if he so far exceeds his privilege as to be guilty of some other offense. In other words resisting an unlawful arrest is not in itself a crime, whether it is by the intended arrestee or by others who come to his aid." [7]

---

7. In the 1969 edition, however, Perkins repeated that under the

This State follows the view that if an arrest is illegal, the arrestee is justified in using any reasonable means, even force, to effect his escape. *Williams v. State,* 204 Md. 55, 64; *Sugarman v. State,* 173 Md. 52, 57.[8]

We do not find the evidence sufficient in law to show that Nawrocki was making loud and unseemly noises; there is nothing to indicate that he was talking other than quietly or in a normal tone of voice. Nor do we find it legally sufficient to prove that he was profanely cursing, swearing or using obscene language. The officer's statement that Nawrocki was "using profane language" was a conclusion and in the absence of evidence setting out the language the officer concluded was profane there was not enough for the trier of fact to determine that the language was "profane" within the ambit of the statute. What the officer felt was "profane" may not have been profane within the contemplation of the statute. It was for the trier of fact, not the officer, to ascertain whether

---

common law theory an officer undertaking an arrest which was in fact unlawful was neither discharging the duties of his office nor attempting to do so and that therefore the intended arrestee was privileged to use reasonable force to prevent the unlawful deprivation of his liberty. He then observed: "But the problems involved are so complicated that it is easy for either the officer or the arrestee to be mistaken in regard to the lawfulness of the arrest and it seems wise to require such issues to be decided in court rather than by force and the present trend, by statute, is to provide that there is no privilege to resist an arrest which the arrestee knows is being made by a peace officer, even if the arrest is unlawful." At 496. Maryland has no such statute.

8. "While it is the duty of the citizen to submit to lawful arrest, mere flight to avoid apprehension does not constitute resisting an officer because there is a distinction between avoidance and resistance or obstruction. Jerking away from an officer is obstructing him but cursing him is not, and if an arrestee while being taken to the police station struck the officer for the sole purpose of venting spleen upon him, this constituted an assault but not resistance to arrest. On the other hand, any force wilfully employed to prevent the success of the officer's effort is an obstruction of justice whether by the one to be arrested or by another." Perkins, *Criminal Law* (2d Ed., 1969) 496-497. *Wharton, supra,* says, § 1618: "Generally, some overt act is necessary; and in order that words alone may constitute the offense of wrongfully resisting arrest, it seems that they should be spoken under circumstances affording the person making the arrest reasonable grounds to believe that he cannot proceed with the arrest without incurring evident risk of serious injury. Merely being impertinent to an officer or daring him to make an arrest has been declared insufficient to amount to interference with him in the performance of his duties."

the language was profane *vel non*. A bald statement by the officer characterizing the language as profane is simply not sufficient in law. "It is * * * often true that one man's vulgarity is another's lyric." *Cohen v. California, supra,* at 1788. In any event, profanity *per se* would not amount to disorderly conduct. The words used by Nawrocki would have to be "fighting" words to be punishable. If they were, then he acted in a disorderly manner to the disturbance of the public peace upon a public street in Baltimore City.

It is clear that Nawrocki directed threats to the person the officer had in custody and that those threats were that he was going "to work [the prisoner] over, and do him in and everything right down the line * * * was going to get even with him." We feel the lower court could have decided on the evidence, spare as it was, that Nawrocki's words had a direct tendency to cause acts of violence by the prisoner, that is that they had the characteristic of plainly tending to excite the prisoner, inciting him to a breach of the peace. And because the prisoner was in the legal custody of the officer, charged with the duty of his safekeeping, the directing of the words to the prisoner was in effect the directing of them to the officer who also may have been disturbed or provoked to resentment thereby, culminating in violence. Thus, the lower court properly could have found that the words used by Nawrocki were "fighting" words and concluded that he was guilty of disorderly conduct.[9]

Although the proceedings of a juvenile court are not criminal in nature and its dispositions are not punishment for crime, see *In re Hamill,* 10 Md. App. 586, 591, the rules of evidence applicable to criminal cases apply to

---

9. Rule 912 d. 1. provides: "Upon the conclusion of the adjudicatory hearing, the court shall annouce and dictate to the court stenographer or reporter or prepare and file with the clerk a brief statement of the grounds upon which it bases its determination." The only semblance of compliance with this Rule disclosed by the record before us is the court's statement that he was going to find Nawrocki delinquent "for the reasons stated in this petition." Whether this is sufficient within the contemplation of the Rule is not before us. Nawrocki does not raise the point.

delinquency hearings, Maryland Rule 912 c, and a determination that a child is delinquent must be based upon allegations proved beyond a reasonable doubt, Code, Art. 26, § 70-18 (a). Therefore the sufficiency of the evidence is to be tested as in criminal causes tried without a jury.[10] See Rule 1086; *Williams v. State*, 5 Md. App. 450. We cannot say that the lower court was clearly erroneous in its judgment on the evidence.

## III

Our determination that the evidence was sufficient in law to establish that Nawrocki was a delinquent child disposes of the first eight questions presented on this appeal.[11] The ninth question is "The trial judge in hearing testimony from the two witnesses as to the facts of this case, after a finding of delinquency was made, violated

---

10. Hearing in juvenile causes "shall be conducted by the court without a jury." Rule 908 (a).
We note that § 70-18 (a) also provides: "An uncorroborated confession by a child out of court shall not be sufficient proof of delinquency."

11. The first eight questions presented are:
"1. The evidence was clearly insufficient to support a finding by the Trial Court of Disorderly Conduct by using profane language.
2. The Appellant could not be found delinquent of the offense of Disorderly Conduct by threatening a prisoner in that there is no such offense.
3. The evidence was clearly insufficient to support a finding by the Trial Court of Disorderly Conduct by threatening a prisoner.
4. The evidence was insufficient to support a finding by the Trial Court of Disorderly Conduct by failure to obey a lawful order.
5. The Appellant could not be found delinquent of the offense of Disorderly Conduct by failure to obey a lawful order since there is no such offense.
6. The Appellant could not be found delinquent of the offense of Disorderly Conduct by failure to obey a lawful order because the juvenile petition is insufficient and fails to allege such facts as would enable the Appellant to prepare a defense.
7. The evidence was insufficient to support a finding by the Trial Court of Resisting Arrest.
8. The arrest of the Appellant was illegal and, therefore, he could justifiably resist his arrest by the officer."
We observe that there was no evidence to prove that Nawrocki disobeyed a lawful order of the police within the context of disorderly conduct.

appellant's right to due process of law as guaranteed by the Fourteenth Amendment to the Federal Constitution." This question is prompted by a general confusion shared at various times below by the defense, the prosecution and the court.

When the Legislature revised the general law governing juvenile causes by ch. 432, § 2, Acts 1969, the Act, as implemented and supplemented by ch. 900 of the Maryland Rules of Procedure, effective 1 July 1969, clearly spelled out the principles to be observed and the procedures to be followed by the juvenile courts in the exercise of their jurisdiction. See *In re Hamill, supra.* When a petition under Art. 26, § 70-2 is filed alleging delinquency, see § 70-6, § 70-7, Rule 902 and Rule 903, the court shall hold an adjudicatory hearing, after which, if the allegations are sustained, it shall hold a disposition hearing. Art. 26, § 70-17; Rules 908, 912, 913. However, before the adjudicatory hearing the court may hold a waiver hearing after proper notice, and waive its exclusive jurisdiction. Art. 26, § 70-16; Rule 911. See *Matter of Brown,* 13 Md. App. 625. In a delinquency case the State's Attorney ordinarily prepares and presents the testimony in behalf of a petitioner, Rule 912 b, and a party is entitled to representation by legal counsel at all stages of any juvenile proceeding, Code, Art. 26, § 70-18 (d).

In the instant case petition 149893, made by Officer Smith, authorized by in-take consultant T. Wise, was filed in the juvenile court on 6 July 1971. The petitioner prayed that the court make a finding and pass an order or decree as the law provides. Hearing set for 21 July was postponed so an attorney could be appointed for Nawrocki. An attorney was appointed for him the next day and the petition came on for a hearing on 28 July on a plea of "not delinquent." Rule 904. After the close of the testimony offered by the State through its one witness, the petitioner Officer Smith, the State rested and Nawrocki offered no evidence. He made a motion for judgment of acquittal and it was denied. The court said:

"Walter, I am going to find you delinquent for the reasons stated in this petition which means in effect that I am finding you guilty of the charges against you. You just have a seat a moment, please. I will try to find out some other information before I make a disposition."

There is no doubt that at this point there had been an adjudicatory hearing and a determination of delinquency by the court. The court made this clear during a further inquiry it then made of Smith and its questioning of two witnesses summoned by the State but not called to testify on the merits. During inquiry of them by the court, defense counsel said: "With all due respect I would like to offer an objection to the court. This amounts to testimony again in this case." The court replied: "It is all in disposition. I have made my finding. I am trying to learn as much as I can about the background of this boy." The inquiry of the two witnesses continued. It appears from the record that neither was sworn. The court read into the record Nawrocki's past juvenile record.[12] Requesting Nawrocki to stand, the judge said the two incidents alleged in the petition, although "serious in themselves", did not concern him "as much as the total circumstances which surround you." He then referred to those circumstances, noting that he had read "the very extensive folder that we have in your case and there are some serious matters to be concerned with. You are a very heavy user of drugs. * * * You have been literally the terror of Southeast Baltimore * * *." The judge felt that "the problems here run very deep" with no simple answer. He explained that he had a two-fold purpose: "one, to try to take those steps, those measures which

12. The court said: "I note that on January 25, 1967, the respondent was found delinquent on the charge of malicious destruction of property, given a warning at that time. On June 29, 1970, he was found delinquent on a charge of trespass and was sent to the Maryland Children's Center. I also note on February 28, 1964 he was found delinquent on a charge of being ungovernable and beyond the control of his parents, truancy, assaulting his two year old brother by throwing a carving knife at him, striking him in the forehead, given a warning at that time."

might be of value to you which try to touch upon the roots which have caused these difficulties really for a period of years—years, not months. * * * And the second purpose of mine is to protect the security of the community because the community certainly has a right to expect that protection and must have it." He desired Nawrocki to be examined and evaluated by the court psychiatrist and psychologist so he could have the benefit of their judgment. "I am going to order you to be detained at the Maryland Training School pending these examinations and evaluations. When these are completed you will then be brought back into court and I will make a final disposition at that time." The docket entries with respect to the hearing of 28 July read: "Hearing before Judge Hammerman. Plea: General Denial. Finding: Delinquent." And on 28 July the court issued an order to the Superintendent of the Maryland Training School for Boys empowering him to keep Nawrocki under his care and custody. The order recited that Nawrocki had been "duly adjudged after hearing before Robert I. H. Hammerman" to be "a delinquent child."

Nawrocki was brought back before the court on 1 September 1971. The court clerk correctly thought that Nawrocki was there for disposition: "We have before the Court this morning Petition Number 149893, Jerry Nawrocki, reset for disposition." The court observed that it had "read the various reports that have been submitted to me prior to today on Walter as well as the fact that I have read previous reports that have been made in past years about the boy." Defense counsel, however, told the court that at the conclusion of the hearing of 28 July "Your Honor held the matter sub curia insofar as the delinquency or non-delinquency of Mr. Nawrocki went and requested a medical report in the case." The court did not dispute this statement but entertained two arguments by counsel in support of a motion for judgment of acquittal, advanced as in addition to those presented at the prior hearing. The court denied the motion without comment. Counsel then told the court that while

Nawrocki had been in the Maryland Training School awaiting the instant hearing there had been a riot. Nawrocki and several others not involved in the fight were told by "the people at the school * * * to get out of the area and just to get away for their own safety." So Nawrocki left. He called counsel several days later, stating he was in fear of his life at the school and that he had been beaten up on several occasions. He was reluctant to go back "because he feared for his own health and safety." He did not go back to the school but promised to appear in court and did so. The court in an extended discourse said it was disturbed by the fact Nawrocki had left the training school, although "it could very well have happened exactly as you say * * *." The court expressed the thought that "a training school setting would not be particularly good for you over a long term if you are having these serious difficulties and where you have had difficulties before in adjustment there." But it was "far from convinced that probation is the best thing for you either." The court continued: "[Q]uite frankly I am giving serious thought at this particular moment to whether or not jurisdiction should be waived in your case to the adult criminal court in view of all the materials that I have read and what I am going to do right now is I am going to order you detained at the Maryland Children's Center for a period of thirty days for purposes of evaluation there * * * and at the next hearing it will be for the purpose of and it should be set in for purposes of determining waiving jurisdiction in this matter." An order detaining Nawrocki at the Maryland Children's Center pending hearing on 1 October was issued the same day. Before the hearing of 1 September concluded, however, defense counsel told the court that one of the boys who had given the court information not under oath at the hearing of 28 July had voluntarily come to court and wished to make a statement. Steve Dowling thereupon told the court he had lied at his previous appearance before the court. "I made it a big thing which it wasn't." He then recounted what he alleged were the

true circumstances of the incident relating to the petition alleging Nawrocki's delinquency. The judge felt that if Dowling's new version was correct, Nawrocki "would still be guilty of the charges against him." He said: "I am asking the State's Attorney to see to it that you are prosecuted for perjury." Defense counsel pointed out that Dowling was not under oath and Dowling observed that he had not been under oath when he was interrogated by the court on his previous appearance either. The court stated it would still like the State's Attorney's office to look into prosecuting Dowling on possible charges. It asked Dowling if he was willing to take a lie detector test and Dowling said he was willing. The court said: "All this will go on the lie detector test. Then we will find out. * * * We will find out and we will get to the bottom of it but, as I said, even though this has no bearing on the guilt or innocence of these particular charges." Defense counsel did not agree:

> "I would just like to have, say, one other thing in behalf of Mr. Nawrocki. If in fact what this young man says is true, then the lawful order that the police officer gave, if he gave one, would not have been a lawful order. He would have no reason to order Mr. Nawrocki to do anything if that fact were true. Also, then Mr. Nawrocki could not have been guilty of resisting arrest because he could resist if the police officer didn't have a right to arrest him initially. I'd advance that argument now in view of the testimony."

The court replied: "The testimony of the officer was sufficient to sustain my finding." [13] Counsel said: "Well, if that is the Court's ruling, in any event I would like to advance the argument on behalf of my client, sir." The court answered: "All right."

By letter dated 20 September 1971 the State's Attor-

---

13. This is further indication that the finding of delinquency had been previously made.

ney's Office informed Nawrocki's counsel that it was requesting a waiver of jurisdiction with respect to petition 149893 and that a hearing on the request would be held on 1 October before Hammerman, J. Rule 911 a. A waiver hearing at this stage was patently improper because in our opinion there had already been an adjudicatory hearing. *Matter of Brown, supra.* What occurred at the beginning of the hearing of 1 October is best described in the words of the transcript of the proceedings:

"THE BAILIFF: Jerry Walter Nawrocki, please stand. Your Honor, we have before the court this morning petition number 149893 the respondent, Jerry Walter Nawrocki, set for disposition.

THE COURT: Now, Mr. Karceski, you represent the respondent in this matter, is that correct?

MR. KARCESKI: That is correct, Your Honor.

MR. SEIDEL [Assistant State's Attorney]: Your Honor, this case was marked for a waiver and a waiver notice was sent out.

THE COURT: What case?

MR. SEIDEL: I believe it to be in error. The case was tried on the merits and is in for disposition. I thought we had better clear that up.

THE COURT: Did I indicate that I was going to consider this for waiver of jurisdiction?

MR. KARCESKI: If Your Honor please, I think

THE COURT: What happened on that?

MR. KARCESKI: At the end of the last hearing you decided that you would delay any finding until such time as you received a report from the Maryland Children's Center and then you would make an appropriate decision at that time.

THE COURT: Including the question of jurisdiction?

MR. KARCESKI: If I can remember I am sure Your Honor did say that. I am sure the record reveals it but I think that was the case.

THE COURT: Yes, that is the situation. Mr. Seidel, the case was set in for a delinquency hearing but at the conclusion of it there was a question of whether the matter ought to truly be waived to the criminal court. So, that question is before us also. Mr. Karceski, do you wish to be heard at this time before I make any finding in this matter?"

Counsel renewed the arguments made on the motion for judgment of acquittal at the prior hearings, and then addressed himself at length "to the problem of Mr. Nawrocki himself." At the conclusion of his argument the court said: "Well, I am going to retain jurisdiction in this matter. I am going to find Walter delinquent for the reasons stated in the petition. * * * I am going to commit you to the Department of Juvenile Services for commitment to the appropriate institution and I am sure that they will give weight to the recommendation that you be sent to the forestry camp. It is my hope and desire that our probation department will be able to work out something that is a lot more effective, that will hold out good promise, and if that can be done I would be very happy to be able to authorize your release. That will conclude the hearing then." Under date of 1 October the court issued an order to the Superintendent of the Maryland Training School for Boys empowering and directing him to receive Nawrocki to be kept in his care and custody, subject to the further order of the court. The predicate of the order as recited therein was that "it has been duly adjudged after hearing before Robert I. H. Hammerman, Judge of the Circuit Court of Baltimore City, Division for Juvenile Causes, that Walter Nawrocki is a delinquent child and is by reason thereof in need of care and treatment." As pointed out above, this was the second order issued by the court stating

that Nawrocki had been adjudged a delinquent child, the first being the order of 28 July.

Despite the confusion as to the fact of the determination of delinquency, we find it patent that Nawrocki was found to be a delinquent child at the close of the evidence offered on the merits at the hearing of 28 July. At that point the only evidence before the court was the testimony of Officer Smith and we have decided the propriety of the court's finding of delinquency solely on his testimony. The testimony of the two witnesses about which Nawrocki now complains, as well as what thereafter came before the lower court, washes out in any event as relating only at the most to the disposition phase of the proceedings and has no bearing on the adjudication that Nawrocki was a delinquent child. We hold that in the circumstances there was no violation of due process of law because of the challenged testimony.

## IV

Nawrocki also argues that the trial judge "was predisposed to find [him] delinquent" and thereby violated his constitutional rights to due process of law. He observes that after the finding of delinquency on 28 July the judge remarked that he had "read the very extensive folder" concerning Nawrocki and he urges that to that point the judge had no opportunity to read the folder except prior to the hearing. He also points out that on the petition before the court was noted under the designation of "previous appearance" the numbers of four previous petitions and the year in which they were filed. He concludes that the trial judge "may refer to this information and form an opinion adverse to the youth very early in the proceedings, thereby denying the youth his right to an unbiased trier of fact."

We are not persuaded by such speculation that the lower court was predisposed to a finding of delinquency, or that its finding was based on other than the evidence properly before it on the issue of delinquency *vel non.*

We see no denial of due process of law on the reasons advanced.

*Adjudication of 28 July 1971 of appellant as a delinquent child and disposition order of 1 October 1971 affirmed.*