JOHN EDWARD DOWNS *v.* STATE
OF MARYLAND

[No. 524, September Term, 1975.]

*Decided February 3, 1976.*

The cause was argued before GILBERT, MENCHINE and DAVIDSON, JJ.

*Alan J. Goldstein, Assigned Public Defender,* with whom was *John E. Pleisse, Assigned Public Defender,* on the brief, for appellant.

*Bernard A. Raum, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, David B. Allen, Assistant Attorney General,* and *George R. Sparling, State's Attorney for St. Mary's County,* on the brief, for appellee.

GILBERT, J., delivered the opinion of the Court.

The appellant, John Edward Downs, was convicted by a jury in the Circuit Court for St. Mary's County of disorderly conduct, resisting arrest, and assault and battery. Appellant was sentenced to terms of sixty days in the county jail and to two concurrent three-year sentences under the jurisdiction of the Division of Correction. A sentence review panel, convened pursuant to Md. Rule 762 c 2, altered the original sentences. The panel resentenced appellant to sixty days, three years and three years, respectively under the jurisdiction of the Division of Correction. All sentences were made concurrent and they were suspended. The appellant was placed on probation ". . . for an indeterminate period. . . ."[1]

---

[1] We made it clear that probation may not be for an indefinite period of time. *See* Laurie v. State, No. 359 Sept. Term 1975, C.S.A., filed January 2, 1976. *See also* Md. Ann. Code art. 27, § 641A, wherein it is provided that probation may be ". . . for a period longer than the sentence but not in excess of five years."

On appeal to this Court, appellant challenges the sufficiency of the evidence as to the disorderly conduct charge. He further complains of the trial judge's advisory jury instructions as they related to appellant's failure to obey a command of a police officer. We shall discuss the latter contention first.

Appellant recognizes that he failed to except to the trial judge's instructions, and, therefore, under Md. Rule 756 g he may not now raise any question of error unless there was "plain error" in the instructions. Judge Powers, writing for this Court in *Brown v. State*, 14 Md. App. 415, 422, 287 A. 2d 62, 65 (1972), *cert. denied*, 265 Md. 736 (1972), explained "plain error."

> ". . . [A]s a general guide, we may say that under Rule 756 g we will take cognizance of and correct an irremediable error of commission, but not an error of omission. Of course, the error must be plain, and material to the rights of the accused, and, even then, the exercise of our discretion to correct it should be limited to those cases in which correction is necessary to serve the ends of fundamental fairness and substantial justice."

The trial judge had instructed the jury that:

> ". . . If you find that the Government [sic] has proven beyond a reasonable doubt that the Defendant failed to obey a policeman's command to move on when not to do so may have endangered the public peace, you may find the Defendant guilty of the misdemeanor of disorderly conduct."

While the quoted instruction may be correct as a general principle of law, it was erroneous under the circumstances of this case because there was no evidence whatsoever of the appellant's being told to "move on". According to the arresting officer, Trooper Taylor of the Maryland State Police, the charge of disorderly conduct arose out of the appellant's indecorous remarks that " '. . . all the goddamn policemen in this County are no fucking good, they're just

after me,'" supplemented by a further comment that "['] . . . the fucking niggers in this County are no better than goddamn policemen.[']" The trial judge's seemingly gratuitous charge about failing to obey a police officer's command to "move on" was made without benefit of any evidence to support it. It was an error of commission, but even so we do not believe that "fundamental fairness and substantial justice" require us to reverse the judgment. We so believe because we fail to see how appellant was prejudiced by the instruction. There was, as we have said, no evidence upon which the charge could be bottomed. The jury, having heard the testimony, was aware that the police officer never testified to ordering appellant to "move on". Appellant's movements were not ever in question. The matter was limited to appellant's verbalizing of tasteless remarks. Furthermore, we think that had appellant requested that the erroneous instruction be corrected, the trial judge would have readily done so. The belated recognition by the appellant of the superfluous instruction ". . . does not call for us to correct it now." *Brown v. State*, 14 Md. App. at 422. The standard dealing with "plain error" is set by Rule 756 g. The recent decision of *Dorsey v. State*, 276 Md. 638, 350 A. 2d 665 (1976) is not applicable thereto.

Appellant's argument concerning the sufficiency of the evidence is founded upon the First Amendment to the Constitution as well as Art. 40 of the Maryland Declaration of Rights. Appellant strenuously argues that his freedom of speech has been abridged.

The evidence in this case shows that the appellant was a patron in the Galley Restaurant in Lexington Park, Maryland. Trooper George W. Taylor of the Maryland State Police entered the restaurant for the purpose of meeting a complainant as well as having breakfast. The restaurant was crowded. The trooper took a seat at a table approximately eight feet from where the appellant and three other persons were seated in a booth. The restaurant was fairly noisy. Taylor heard appellant exclaim ". . . in a moderate to above normal tone . . ." that, " '. . . all the goddamn policemen in this County are no fucking good,

they're just after me.' " Taylor said that he felt that the remark was directed toward him, but he let the matter pass. "After two, three, four minutes of this above-normal tone he [appellant] began talking louder and it was at the point of yelling, and he not only was at this time talking about the GD policemen and picking on him and beatin' up on him, so forth, he started talking about [']the fucking niggers in this County are no better than goddamn policemen[']". Appellant acknowledged that he made a comment about police officers which included the profanity described by Taylor, but he denied making the racial slur.

Taylor told the jury that approximately ten (10) percent of the patrons were black. He stated that two young black women were seated ". . . at the counter which was across from his [appellant's] booth approximately four feet away." When the racial slur allegedly was uttered by appellant, Taylor went over to the booth in which appellant was seated and ". . . advised Mr. Downs [appellant] that he would have to refrain from the profanity and tone down his tone of speaking, that it was disruptive. . . ." Appellant purportedly replied, " 'Well, who in the fuck said anything to you, anyway? You're not in this goddamn conversation.' " Taylor warned that if appellant did not " '. . . refrain from . . . yelling and . . . [using] profane language . . .' " he would be placed under arrest. Appellant informed the trooper that, " 'You ain't bad enough to place me under arrest.' " Appellant was wrong. He was placed under arrest by the trooper. When the trooper grabbed appellant by the arm the appellant, according to the trooper, ". . . broke loose . . . and struck . . . [the trooper] across the arm and left part of . . . [his] chest." A struggle ensued with the trooper eventually prevailing.

We note that at the time of arrest and at the time of trial appellant was carrying what he apparently believed to be a "license for police baiting." Appellant, at the trial, produced a page from an unidentified publication in which the following was reported:

"LAW AND ORDER

You can call your local cop a MOTHER (fornication

expletive deleted) PIG or any other name and there is NOT A THING he can do to you LEGALLY, not even tell you to shut up. . . . The U.S. Supreme Court has said so INDIRECTLY by refusing to back Arkansas in a recent COP BADMOUTH case. . . ."

Perhaps appellant would have exercised more discretion had he been mindful of an old folk saying that, "It ain't the things you don't know what gets you into trouble; it's the things you know for sure what ain't so." *Best Quotations for All Occasions* 126 (L. Henry 1948).

Appellant was tried in the circuit court on a Statement of Charges,[2] after praying, at the District Court, a jury trial.

Md. Ann. Code, art. 27, § 123 (c) provides:

"No person shall act in a disorderly manner to the disturbance of the public peace, upon any public street, highway, . . . place of public worship, . . . or amusement in any city, town or county of this State, or in any store during business hours. . . ."[3]

Appellant asserts that in order to be punishable, the words that he used in his conversation with the two women and a man that were seated in the booth with him, must be either "obscene" or "fighting words." *Reese v. State,* 17 Md. App. 73, 299 A. 2d 848 (1973). There was within this record no evidence that the objectionable language was erotic or produced "psychic stimulation." *Reese,* 17 Md. App. at 80-81, citing *Cohen v. California,* 403 U. S. 15, 91 S. Ct. 1780, 29 L.Ed.2d 284 (1971).[4] To be obscene in the Constitutional sense, the words employed must conjure up in the mind of those confronted with the words of the expression some erotic psychic stimulation. *Reese v. State, supra; Matter of*

---

2. Md. Rule 725.

3. The statute provides penalties of a fine of not more than $50, or confinement in jail for not more than sixty (60) days or both.

4. *Cohen* was another five to four decision. The late Mr. Justice Harlan authored the majority opinion and was joined therein by Justices Douglas, Brennan, Stewart, and Marshall. Mr. Justice Blackmun dissented; the Chief Justice and the late Mr. Justice Black joined the dissent. Mr. Justice White joined the dissent in part. Two of the majority and one of the minority are no longer on the Court.

*Nawrocki,* 15 Md. App. 252, 260, 289 A. 2d 846, 851 (1972). *See also Cohen v. California, supra.* Consequently, we must determine whether the epithets hurled by appellant fall within the definition of "fighting words." If they do not, then appellant has not violated the provisions of the Maryland "Disorderly Conduct" statute. *Reese v. State, supra.*

Mr. Justice Murphy, writing for a unanimous Court in *Chaplinsky v. New Hampshire,* 315 U. S. 568, 62 S. Ct. 766, 86 L. Ed. 1031 (1942) defined "fighting words" as ". . . those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." 315 U. S. at 572. We infer that by the use of the phrase "inflict injury" the Court was speaking of injury to the psyche, the ego, the id, the emotions. The Court, in *Chaplinsky,* implicitly branded as incorrect the old English cliche, "That sticks and stones will break my bones but words can never harm me."

The First Amendment proviso relative to "freedom of speech" was never intended by our founding fathers to license any and all use of profane language under any and all circumstances. "Speech is not an absolute, above and beyond control by the legislature when its judgment, subject to review here, is that certain kinds of speech are so undesirable as to warrant criminal sanction." *Dennis v. United States,* 341 U. S. 494, 508, 71 S. Ct. 857, 866, 95 L. Ed. 1137, 1152 (1951) (C. J. Vinson). Stated another way, free speech is not an absolute, unencumbered by any responsibility on the part of the speaker. Mr. Justice Holmes in *Schenck v. United States,* 249 U. S. 47, 52, 39 S. Ct. 247, 249, 63 L. Ed. 470, 473 (1919) made clear that free speech carries with it some concomitant duty, when he wrote, "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic. . . . The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that . . . [the legislature] has a right to prevent. It is a question of proximity and degree."

While the appellant admitted using ". . . a word from that [the above quoted article]", he denied that he was

referring to Trooper Taylor. We think, however, that a rational inference may be drawn from the appellant's possession of the article and his acknowledgment that he used a word therefrom in his disparaging "anti-police" comment made in a loud voice, that appellant was, in fact, goading the trooper.

The courts have differed as to whether pejorative remarks similar to those voiced by appellant constitute "fighting words",[5] but we need not and do not decide in this case that question because the trooper's testimony that the disdainful comment " '. . . the goddamn policemen in this County are no fucking good . . .' " merely "caused" the officer ". . . to turn and look towards him [appellant]." Patently, Trooper Taylor was not aroused by the derisive epithet and, apparently, having been trained to resist provocation, he elected not to respond to the appellant's self-proclaimed ignorance.

We turn now to a discussion of the second comment passed by appellant, the remark which led to his being initially admonished by the trooper and within seconds thereafter arrested for disorderly conduct.

It has often been said that, "A little knowledge is a dangerous thing." Appellant has unwittingly proven, in this case, the wisdom of that maxim. The Supreme Court case to which the above quoted article alludes is not named or cited in the article nor has either the appellant or the State referred to it in their respective briefs. Our research, however, leads us to believe that the case which is unidentified in the article is *Lucas v. State,* 254 Ark. 584, 494 S.W.2d 705 (1973) which the Supreme Court, by order, without an accompanying opinion, *Lucas v. Arkansas,* 416

---

**5.** *See* Annot., 34 A.L.R. 566 (1925) (Opprobrious words addressed to policeman as breach of peace). Remarks were deemed to constitute "fighting words" or disorderly conduct in Landry v. Daley, 288 F. Supp. 183 (N.D. Ill. 1968); Whited v. State, 256 Ind. 386, 269 N.E.2d 149 (1971); City v. Morris, 258 Minn. 467, 104 N.W.2d 902 (1960). *Contra* Oratowski v. Civil Service Comm'n, 3 Ill. App. 2d 551, 123 N.E.2d 146 (1954); City v. Guidotti, 81 Ohio L. Abs. 33, 160 N.E.2d 355 (1958); Lane v. Collins, 29 Wis. 2d 66, 138 N.W.2d 264 (1965).

U. S. 919 (1974),[6] vacated and remanded " . . . for further consideration in the light of *Lewis v. City of New Orleans,* 415 U. S. 130 (1974)." We do not know what happened as a result of the remand, but the Supreme Court in *Lucas* merely vacated the judgment; it did not reverse it. Reliance upon such a slender reed for a course of conduct that appears to be calculated to bring about a confrontation with a police officer is, at the very least, foolhardy.

In any event, neither *Lucas* nor *Lewis* laid down a new set of guidelines nor did either differ from *Chaplinsky. Lewis* held a New Orleans City ordinance proscribing the use of "opprobrious language" as being overly broad and outside the scope of *Chaplinsky's* definition of "fighting words." *Lucas* was remanded in order for the Arkansas court to determine whether that State's statutory language was without the ambit of *Lewis*. Both *Lucas* and *Lewis* were concerned with language used toward police officers. Neither addressed itself to a situation akin to that now before us.

The question that we must answer is: Are the words "['] . . . the fucking niggers in this County are no better than goddamn policemen[']" considered "fighting words" within the meaning of *Chaplinsky*? We have previously indicated in *Reese v. State, supra,* that " . . . derisive and annoying words would be 'fighting words' only when they have the characteristic of plainly tending to excite the addressee to a breach of [the] peace." 17 Md. App. at 82. The coarse, vulgar remarks passed by appellant in a loud, "yelling" type of voice, under the circumstances of this case, we think, entitled the trier of fact to infer that the strong racial slur "inflicted injury" and "tend[ed] to incite an immediate breach of the peace." We do not believe that the State must demonstrate that a riot or fight was on the verge of occurring, and, but for the officer's intervention, would have happened. In our view, it is enough for the State to show the words used were such that men of common intelligence

---

6. Mr. Justice Blackmun filed a vigorous dissent. He was joined therein by the Chief Justice and Mr. Justice Rehnquist. The text of the dissent is reported in 416 U. S. 919-922.

would understand that such words would so arouse emotion that the average person or persons to whom they were addressed, directly or indirectly at the time spoken, would be stirred to the point of violent eruption or fighting.

We hold that the expression "[']the fucking niggers in this County are no better than goddamn policemen[']" spoken in a loud voice or "yelled" in a restaurant filled with a racially mixed crowd were "fighting words" falling within the definition of that term, as it is used in *Chaplinsky*. We observe no error on the part of Judge Mattingly in refusing to grant a judgment of acquittal at the close of the evidence inasmuch as there was sufficient evidence of a violation of the Disorderly Conduct statute to take the matter to the jury.

Appellant does not assert any contention that the evidence was legally insufficient to sustain the assault and resisting arrest convictions. He is seemingly content to ground his attack on the circuit court's judgment along the Constitutional lines previously discussed. Appellant obviously feels that if his conviction for disorderly conduct fell, the arrest would of necessity be invalid and his subsequent conduct would be lawful. *Midgett v. State*, 216 Md. 26, 139 A. 2d 209 (1958). Appellant, however, has not prevailed. The arrest and conviction for disorderly conduct are proper, and, hence, the assault and resisting arrest convictions, it follows, will be affirmed.

> *Convictions affirmed.*
> *Sentences vacated and case re-manded for the imposition of proper sentences.*