## JOHN EDWARD DOWNS v. STATE OF MARYLAND

[No. 27, September Term, 1976.]

*Decided November 30, 1976.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE and ELDRIDGE, JJ.

*Dennis M. Henderson, Assistant Public Defender,* with

whom was *Alan H. Murrell, Public Defender*, on the brief, for appellant.

*Gilbert H. Robinette, Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General*, and *Clarence W. Sharp, Assistant Attorney General*, on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court.

We granted certiorari to consider whether, in the circumstances of this case, certain vulgar language constituted "fighting" words within the sense contemplated by *Chaplinsky v. New Hampshire*, 315 U. S. 568, 62 S. Ct. 766, 86 L. Ed. 1031 (1942), and its progeny, and were therefore outside of the protection of the First Amendment.

Appellant Downs was conversing with three friends while eating an early morning breakfast in a Lexington Park restaurant. In the course of the conversation Downs said in a loud voice, "All the goddamn policemen in this County are no fucking good, they're just after me." A few minutes later he loudly said, "[T]he fucking niggers in this County are no better than goddamn policemen." A uniformed State Trooper (Trooper Taylor) sitting at a table about eight feet away from the booth in which Downs and his friends were seated overheard these remarks.

The trooper went over to Downs' booth and told him that his talk was disruptive and that he would be placed under arrest if he did not refrain from using such profane language. Downs replied, "You ain't bad enough to place me under arrest," whereupon the trooper grabbed him and informed him that he was under arrest for disorderly conduct. A scuffle ensued, but Taylor finally managed to handcuff Downs.

Downs was charged with disorderly conduct in violation of Maryland Code (1957, 1976 Repl. Vol.) Art. 27, § 123 (c),[1]

---

1. Section 123 (c) provides, in pertinent part:
    "(c) No person shall act in a disorderly manner to the disturbance of the public peace . . . at any place of . . . public resort or amusement . . . or in any store during business hours . . . in any city, town or county of this State."

resisting arrest, and assault and battery. At his trial before a jury in the Circuit Court for St. Mary's County, it was established that the restaurant was crowded, busy, and noisy. All but three or four of the 20 stools at the counter were occupied, as well as all the tables and booths. Approximately 35 to 45 persons were in the restaurant; three or four were black. Two black women were sitting at the counter about four feet from the booth in which Downs and his friends were sitting. Downs had a newspaper article in his possession; it said:

> "You can call your local cop a MOTHER (fornication expletive deleted) PIG or any other name and there is NOT A THING he can do to you LEGALLY, not even tell you to shut up. . . . The U.S. Supreme Court has said so INDIRECTLY by refusing to back Arkansas in a recent COP BADMOUTH case. . . ."

Trooper Taylor testified that he could hear Downs' remarks as distinct from the general noise level of the restaurant. He was not personally aroused by the reference to police officers but was concerned only about the provocativeness of the racial remarks in the racially mixed crowd. Two of Downs' friends who were seated with him during the incident testified; both said that the remarks were not directed to anyone in particular but were merely part of the general conversation between Downs and themselves. One of the cooks and a patron of the restaurant testified; neither could distinguish Downs' remarks from the general din. Downs himself said that his remarks were not directed to anyone in particular.

The jury found Downs guilty on all three charges. His original sentence of sixty days on the disorderly conduct charge and concurrent three-year sentences on the resisting arrest and assault and battery charges were modified by a sentence review panel to suspended sentences and indeterminate probation. The Court of Special Appeals affirmed the convictions but vacated the indeterminate probation because it was not in accord with Code, Art. 27,

§ 641A. *Downs v. State,* 30 Md. App. 253, 351 A. 2d 166 (1976).

The Court of Special Appeals did not consider whether the remarks about police officers constituted "fighting" words because the State Trooper was not offended or angered by them. It considered the remark about blacks and found that "the strong racial slur" amounted to "fighting" words because the trier of fact could have inferred from the volume of Downs' voice and from the racial composition of the crowd that the comment " 'inflicted injury' " and " 'tend[ed] to incite an immediate breach of the peace.' " 30 Md. App. at 261, 351 A. 2d at 171. The court found it unnecessary for the State to prove that a fight or a riot was imminent. All that it need show was that "the average person or persons to whom [the words] were addressed, directly or indirectly at the time spoken, would be stirred to the point of violent eruption or fighting." *Id.* at 262, 351 A. 2d at 171.

The doctrine of "fighting" words was originated by the Supreme Court in 1942 in *Chaplinsky v. New Hampshire, supra.* Chaplinsky was distributing religious literature, and the City Marshal had received complaints about it. After being twice warned of the complaints by the marshal, Chaplinsky said to him, "You are a God damned racketeer" and "a damned Fascist and the whole government of Rochester are Fascists or agents of Fascists." He was found guilty of violating a statute which prohibited ". . . address[ing] any offensive, derisive or annoying word to any other person who is lawfully in any street or other public place, [or] call[ing] him by any offensive or derisive name . . . ."

In a now classic passage, the Court said:

> "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words — those which by their very utterance inflict injury or tend to incite an

immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."
315 U. S. at 571-72, 62 S. Ct. at 769, 86 L. Ed. at 1035.

The Court adopted the construction of the statute by the highest court of New Hampshire which had limited its application to words having " 'a direct tendency to cause acts of violence by the persons to whom, individually, the remark is addressed.' " 315 U. S. at 573, 62 S. Ct. at 770, 86 L. Ed. at 1036, quoting *State v. Brown*, 68 N. H. 200, 38 A. 731 (1895); *State v. McConnell*, 70 N. H. 294, 47 A. 267 (1900). According to the New Hampshire court, the statute prohibited " '. . . face-to-face words plainly likely to cause a breach of the peace by the addressee . . . .' " *Id.* at 573, 62 S. Ct. at 770, 86 L. Ed. at 1036. " 'The test is what men of common intelligence would understand would be words likely to cause an average addressee to fight.' " *Id.* Noting that the terms " 'damned racketeer' " and " 'damned Fascist' " are "likely to provoke the average person to retaliation," *Id.* at 574, 62 S. Ct. at 770, 86 L. Ed. at 1036, the Supreme Court affirmed Chaplinsky's conviction.

Although *Chaplinsky* makes it clear that "fighting" words are outside of the protection of the Constitution, it was not made clear in that case whether the words must be directly addressed to someone who is either injured thereby or incited to a breach of the peace. The New Hampshire construction adopted by the Supreme Court referred, somewhat inconsistently, to the individual to whom a remark is addressed and to the average addressee. In *Chaplinsky*, the words were addressed to a particular individual, but there was no evidence that the marshal was either injured or incited. The Supreme Court was satisfied that an "average" person would be provoked to retaliate.

Later cases have resolved this ambiguity and make it clear that the only speech which can be punished, in this context,

is that which has " 'a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed.' " *Gooding v. Wilson*, 405 U. S. 518, 524, 92 S. Ct. 1103, 1107, 31 L.Ed.2d 408, 415 (1972), quoting *Chaplinsky*. In effect, "fighting" words have been recognized as having some social value and are punishable now not on a "per se" basis but only when there is a likelihood of imminent disturbance.

The first limitation on the "fighting" words doctrine occurred in *Cohen v. California*, 403 U. S. 15, 91 S. Ct. 1780, 29 L.Ed.2d 284 (1970), where the Court reversed Cohen's conviction for "maliciously and willfully disturb[ing] the peace or quiet of any neighborhood or person ... by ... offensive conduct" by wearing into the Los Angeles Courthouse a jacket bearing the words "Fuck the Draft." The Court described "fighting" words as "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." 403 U. S. at 20, 91 S. Ct. at 1785, 29 L.Ed.2d at 291. It assumed that the words must be "directed to the person of the hearer." *Id.* The slogan on Cohen's jacket did not fall into that category because it was not directed to anyone in particular and there was no evidence that anyone who saw it was aroused. The Court went on to defend Cohen's use of the admittedly vulgar word "fuck." It refused to allow the State the right "to cleanse public debate to the point where it is grammatically palatable *to the most squeamish among us*" because it concluded that "one man's vulgarity is another's lyric." 403 U. S. at 25, 91 S. Ct. at 1788, 29 L.Ed.2d at 294. By these words, the Supreme Court has made it difficult to find any curse words *inherently* provocative.

The second limitation occurred two years later in *Gooding v. Wilson, supra.* During an anti-war protest, Wilson said to police officers attempting to move him from the door of a military building, "White son of a bitch, I'll kill you." "You son of a bitch, I'll choke you to death." "You son of a bitch, if you ever put your hands on me again, I'll cut you all to pieces." He was convicted under a Georgia statute which

provided: "Any person who shall, without provocation, use to or of another, and in his presence . . . opprobrious words or abusive language, tending to cause a breach of the peace . . . shall be guilty of a misdemeanor." Because the Georgia appellate courts had not limited the application of the statute to words that "have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed," 405 U. S. at 524, 92 S. Ct. at 1107, 31 L.Ed.2d at 408, the Supreme Court found the statute unconstitutional on its face. The *Chaplinsky* element of merely "inflicting injury" was not mentioned. The new test appears to require the likelihood that ". . . the person addressed would make an immediate violent response." *Id.* at 528, 92 S. Ct. at 1109, 31 L.Ed.2d at 417. Thus, while affirming the proposition that "fighting" words are punishable under a narrowly drawn statute, the Court so limited the application of the original doctrine that Mr. Justice Blackmun, in dissent, said that the Court "is merely paying lip service to *Chaplinsky.*" *Id.* at 537, 92 S. Ct. at 1113, 31 L.Ed.2d at 422.

The Court has dealt in a summary fashion with "fighting" words cases arising since *Gooding.* In *Rosenfeld v. New Jersey,* 408 U. S. 901, 92 S. Ct. 2479, 33 L.Ed.2d 321 (1972) (mem.), it vacated and remanded without opinion in light of *Cohen* and *Gooding* a conviction for disorderly conduct under a statute prohibiting "loud and offensive or profane or indecent language in any . . . public place . . . ." The defendant had used the term "mother fucker" several times at a public school board meeting. Mr. Justice Powell, in dissent, recognized that the defendant's words were not directed to a specific individual and that physical violence on the part of the audience was unlikely. His argument that the words could have offended the sensibility of the audience was unheeded by the majority. In *Brown v. Oklahoma,* 408 U. S. 914, 92 S. Ct. 2507, 33 L.Ed.2d 326 (1972) (mem.), the Supreme Court vacated and remanded in light of *Cohen* and *Gooding* a conviction under a statute prohibiting obscene or lascivious language in a public place or in the presence of females. During a meeting at which no police officers were present, Brown had referred to police officers in general and

to one in particular as "mother fucking Fascist pigs." In *Lewis v. City of New Orleans*, 408 U. S. 913, 92 S. Ct. 2499, 33 L.Ed.2d 321 (1972) (mem.), the Court vacated and remanded in light of *Gooding* a conviction under a statute prohibiting cursing, reviling, or using obscene or opprobrious language to a police officer while in the performance of his duties. Lewis had called the police officers "God damned mother fuckers." Mr. Justice Powell, concurring, would have considered the words to be "fighting" words had they been addressed face to face in a hostile manner to someone other than a police officer, trained to exercise restraint.

Upon remand to the Louisiana Supreme Court, Mrs. Lewis' conviction was affirmed. 263 La. 809, 269 So. 2d 450 (1972). The United States Supreme Court, finding the statute facially invalid, reversed and remanded. 415 U. S. 130, 94 S. Ct. 970, 39 L.Ed.2d 214 (1974). Four more cases followed in quick succession, all involving the constitutionality of statutes prohibiting loud, profane, insulting, lewd or boisterous words. By memorandum decisions, the Court vacated the judgment in each case and remanded in light of the second *Lewis* decision. *Lucas v. Arkansas*, 416 U. S. 919, 94 S. Ct. 1917, 40 L.Ed.2d 277 (1974);[2] *Kelly v. Ohio*, 416 U. S. 923, 94 S. Ct. 1922, 40 L.Ed.2d 280 (1974); *Rosen v. California*, 416 U. S. 924, 94 S. Ct. 1922, 40 L.Ed.2d 280 (1974); *Karlan v. City of Cincinnati*, 416 U. S. 924, 94 S. Ct. 1922, 40 L.Ed.2d 280 (1974).[3]

Having traced the development of the "fighting" words doctrine, we now apply it to the facts in this case. We need not consider whether Downs' first remark, "All the goddamn policemen in this County are no fucking good, they're just after me," constituted "fighting" words because the state trooper, a possible addressee, was not aroused by the

---

2. On remand, the state court conviction was affirmed, 520 S.W.2d 224 (Ark. 1975). The Supreme Court dismissed the appeal for want of a substantial federal question. 423 U. S. 807, 96 S. Ct. 17, 46 L.Ed.2d 28 (1975).

3. On remand, Karlan's conviction was affirmed. 39 Ohio St. 2d 107, 314 N.E.2d 162 (1974). The Supreme Court denied cert., 419 U. S. 1056, 95 S. Ct. 640, 42 L.Ed.2d 654 (1974).

comment. We need only examine his second remark, "[T]he fucking niggers in this County are no better than goddamn policemen." Since *Cohen v. California, supra,* apparently teaches that the use of the adjective "fucking" is not punishable in the absence of compelling reasons, the potentially punishable words are "[T]he niggers in this County are no better than goddamn policemen." This remark was made by Downs during a conversation with friends. There was no direct evidence that it was spoken to anyone other than the persons sitting in the booth with Downs. Even if there were, no evidence was adduced that anyone else, beside Trooper Taylor, heard this statement. Even if someone else did, there was no evidence that he or she was offended by it. And, even if someone were offended by it, there was no evidence that any person was so aroused as to respond in a violent manner. Thus, Downs' remarks were not the kind of personally abusive epithets which fall outside of the protection of the First Amendment under the rubric of "fighting" words. He engaged in protected speech. That his views might be offensive to someone who overheard him does not warrant a conviction for disorderly conduct. *Bachellar v. Maryland,* 397 U. S. 564, 90 S. Ct. 1312, 25 L.Ed.2d 570 (1970). Accordingly, we hold that the trial judge erred in not granting Downs' motion for judgment of acquittal on the disorderly conduct charge, and that conviction must be reversed.

> *Judgment of the Court of Special Appeals affirming the conviction for disorderly conduct reversed; case remanded to that Court with instructions to remand it to the Circuit Court for St. Mary's County for a new trial; costs to be paid by the County Commissioners of St. Mary's County.*