FRED CARROLL LUCAS AND RONNIE RAY LUCAS v. STATE OF ARKANSAS

CR 73-31                                    494 S.W. 2d 705

Opinion delivered May 28, 1973
[Rehearing denied July 2, 1973.]

*Fred A. Newth, Jr.,* for appellants.

*Jim Guy Tucker,* Atty. Gen., by: *Charles A. Banks,* Asst. Atty. Gen., for appellee.

J. FRED JONES, Justice. Fred and Ray Lucas were convicted of abusive language defined as a breach of the peace under Ark. Stat. Ann. § 41-1412 (Repl. 1964) and were sentenced to 90 days imprisonment on the Pulaski County Penal Farm. On appeal to this court they rely on a single point stated as follows:

"Ark. Stats. Ann. § 41-1412 (Repl. 1964) is so vague and overbroad as to violate the freedom of speech guarantee of the First and Fourteenth Amendments to the Constitution of the United States."

The pertinent part of § 41-1412, under which the appellants were charged and convicted, reads as follows:

"If any person shall make use of any profane, violent, vulgar, abusive or insulting language toward or about any other person in his presence or hearing, which language in its common acceptation is calculated to arouse to anger the person about or to whom it is spoken or addressed, or to cause a breach of the peace or an assault, shall be deemed guilty of a breach of the peace, and upon conviction thereof shall be punished by a fine of not less than five [$5.00] nor more than two hundred dollars [$200] or by imprisonment in the county jail for not less than one [1] nor more than six [6] months. . . ."

The sufficiency of the evidence to sustain the conviction is not questioned on this appeal so we shall only refer to so much of it as is necessary to this opinion. Officer J. B. Williams of the North Little Rock Police Department testified that about 11:55 P.M. he was on routine patrol in the performance of his duties, and as he drove his police patrol car through a parking lot adjacent to a motel and restaurant, he heard some loud language. He said he thought some people were fighting or something, so he rolled the glass down on his patrol car and heard one of the appellants say: "Well, there goes the big, bad m— f— cops." He said he ignored the language he heard but as he slowly drove on through the parking lot, the "language increased and it got worse and louder." He said that at this point it dawned on him that the appellants were referring to him. He said he drove his patrol car over near a big parking sign and the abusive language continued toward him. He said as he pulled over behind the sign, the appellants said: "Look at the ——, ——, hide over there behind that sign." He said he then drove back across the parking lot and the appellants continued to curse, "they said, 'Now the sorry son-of-a-bitch is going to come back over here.' " He said he parked his patrol car and by that time the appellants had gone inside the restaurant. He said that after he and other officers got the appellants into the patrol car under arrest, they spat on him, continued to call him s.o.b. and used other vile and obscene language about his mother and father. The exact language deleted above as well as the gutter type language concerning the officer's mother and father is set out in the record, but would be of no literary or judicial value if repeated here.

Fred Lucas testified that another officer had given his brother Ronnie a traffic ticket he and Ronnie did not think they deserved and they were angry about that. Fred Lucas said he did not remember spitting on Officer Williams. He admitted calling him a s.o.b. several times and testified that if that epithet was directed to him, it would make him angry. He did not deny using the other language attributed to him by Officer Williams.

The appellants cite several United States Supreme Court decisions as support for their argument that Ark.

Stat. Ann. § 41-1412 (Repl. 1964) is so vague and broad it violates the freedom of speech guaranteed by the First Amendment as applied to the states under the Fourteenth Amendment, but we find the answer to this contention in the case of *Chaplinsky* v. *New Hampshire,* 315 U.S. 568, where the United States Supreme Court said:

> "It is now clear that 'Freedom of speech and freedom of the press, which are protected by the First Amendment from infringement by Congress, are among the fundamental personal rights and liberties which are protected by the Fourteenth Amendment from invasion by state action.' *Lovell* v. *Griffin,* 303 U.S. 444, 450.
>
> * * *
>
> Allowing the broadest scope to the language and purpose of the Fourteenth Amendment, it is well understood that the right of free speech is not absolute at all times and under all circumstances. There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. 'Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument.' *Cantwell* v. *Connecticut,* 310 U.S. 296, 309-310."

The other cases cited by the appellants have to do with breaches of peace brought about by language arousing public anger or indignation under statutes considerably different from our own. The appellants rely heavily on the case of *Gooding* v. *Wilson,* 405 U.S. 518, 92 S. Ct. 1103, 31 L. Ed. 2d 408 (1972), where a Georgia sta-

tute was struck down because it was overbroad in its application and susceptible of First Amendment violations. The Georgia statute, § 26-6303, struck down in *Gooding*, read as follows:

> "Any person who shall, without provocation, use to or of one another, and in his presence . . . opprobrious words or abusive language, tending to cause a breach of the peace . . . shall be guilty of a misdemeanor."

The Supreme Court held in *Gooding* that the state courts had failed to narrow the application of the statute to "fighting words" which "by their very utterance" would tend to incite an immediate breach of the peace and, therefore, the statute on its face was vague and overbroad and unconstitutional under the First and Fourteenth Amendments. The language used by the court to emphasize this holding appears as follows:

> "Because earlier appellate decisions applied § 26-6303 to utterances where there was no likelihood that the person addressed would make an immediate violent response, it is clear that the standard allowing juries to determine guilt 'measured by common understanding and practice' does not limit the application of § 26-6303 to 'fighting' words defined by *Chaplinsky*. Rather, that broad standard effectively 'licenses the jury to create its own standard in each case.' *Herndon* v. *Lowry*, 301 U.S. 242, 263 (1937). Accordingly, we agree with the conclusion of the District Court, '[t]he fault of the statute is that it leaves wide open the standard of responsibility, so that it is easily susceptible to improper application.' 303 F. Supp. at 955-956."

The standard fixed for the jury in applying the Georgia statute was exemplified in the case of *Fish* v. *State*, 52 S.E. 737, where the Georgia Supreme Court held that a jury question was presented under the statute by the language "You swore a lie." In *Fish* the standard set for the jury by the state court under the statute was as follows:

> "On the trial of one indicted for using opprobrious

words and abusive language, it is for the jury to determine whether under all the facts and circumstances the words used were of such character as that the use of them was calculated to cause a breach of the peace, as well as to determine whether there was provocation sufficient to excuse their use."

The court in *Gooding* cited another Georgia case, *Jackson* v. *State*, 80 S.E. 20, where the opprobrious words were "God damn you, why don't you get out of the road?" The Supreme Court in *Gooding* said: "Plainly, although 'conveying . . . disgrace' or 'harsh insulting language,' these were not words 'which by their very utterance. . . tend to incite an immediate breach of the peace."

In reference to Ark. Stat. Ann. § 41-1412 (Repl. 1964) in *Holmes* v. *State,* 135 Ark. 187, 204 S.W. 846, we said:

"It will be observed that the statute defines the character of language constituting the offense as 'profane, violent, abusive or insulting language *** which language in its common acceptation is calculated to arouse to anger the person about or to whom it is spoken or addressed, or to cause a breach of the peace,' etc. The language used must be in its nature 'profane, violent, abusive or insulting' and it must be of that character which 'in its common acceptation is calculated to arouse to anger the person about or to whom it is spoken or addressed, or to cause a breach of the peace or an assault.' It is not sufficient that the language used gives offense to the person to whom or about whom it is addressed, but it must be that which in its ordinary acceptation is calculated to give offense and to arouse anger."

As we construe § 41-1412 it is narrowed to "fighting words" addressed to, toward, or about another person in his presence or hearing, which language in its common acceptation is calculated to arouse to anger the person about or to whom it is spoken or addressed, or to cause a breach of the peace or an assault. We can conceive of no stronger "fighting words" than those employed by the appellants in this case, and there is substantial evidence they were calculated to arouse to anger the officer

to whom they were spoken or addressed. As a matter of fact the appellant, Fred Lucas, admits that if the mildest of the epithets employed by him, were directed to or about him, it would arouse him to anger.

Perhaps a well-trained police officer, by virtue of his training and the nature of his profession, should be conditioned, or even immune to some extent, to uncomplimentary remarks from that segment of society that recognizes no bounds in the exercise of the constitutional right to free speech; but no person, whether in police uniform or not, should be expected or required to sacrifice all his own rights to human dignity and self-respect to the perverted idea that such language as was directed to Officer Williams in this case is protected by the First Amendment to the Constitution. We conclude that the "freedom of speech" contemplated by the First Amendment to the Constitution is not even remotely involved in this case.

The judgment is affirmed.