599 A.2d 1221

Michael A. BRIGGS

v.

STATE of Maryland.

No. 416, Sept. Term, 1991.

Court of Special Appeals of Maryland.

Jan. 7, 1992.

José Felipé Anderson, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Kreg Paul Greer, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Christian J. Jensen, State's Atty. for Caroline County of Denton, on the brief), for appellee.

Submitted before MOYLAN, GARRITY and ALPERT, JJ.

ALPERT, Judge.

We are asked to determine whether the appellant, Michael A. Briggs, was properly convicted of assault, disorderly conduct, and resisting arrest, and whether the trial court properly refused to instruct the jury about self defense.

The appellant was charged with disorderly conduct, three counts of battery, resisting arrest, and two counts of malicious destruction of property. Briggs's jury trial was conducted on January 11, 1991 in the Circuit Court for Caroline County, Wise, J., presiding, and he was convicted on all counts except one of the malicious destruction of property charges. Judge Wise sentenced Briggs to sixty days incarceration each for disorderly conduct and for malicious destruction of property. He also sentenced Briggs to two years incarceration for each of the battery counts, and six years for resisting arrest. Briggs now appeals, presenting the following questions:

1. Was the evidence sufficient to sustain Appellant's convictions for any charged assault or disorderly conduct, or resisting arrest?

2. Did the trial court err when it refused to give proper jury instructions regarding self defense?

## FACTS

The police charged Briggs with the aforementioned crimes as the culmination of an episode that occurred on the evening of July 30, 1990, at the annual Federalsburg Carnival in Caroline County. Briggs had been gambling at the Federalsburg Volunteer Fire Company's dice table. The firemen testified that as Briggs began losing at the game, he also began cursing, using obscenities at an increasingly loud volume. One fireman testified that Briggs grabbed from the table the money he had just lost. He also was rough with the gaming table, throwing the dice at it hard enough to bounce off its surface. The firemen tried unsuccessfully to dissuade Briggs from acting this way, and eventually they sought police help.

Briggs's account and the officers' accounts differ as to what transpired next. Officer Adams testified that as he and Officers Miles and Collins approached the gambling booth, he saw Briggs yelling and screaming profanities. Briggs looked at Miles and asked, "What the fuck do you want?" Adams told Briggs that he would have to leave the carnival, and Briggs replied, "Fuck you, I don't have to leave if I don't want to." The police told Briggs that he would have to leave because he was offending people, and he could not continue to stand there and shout obscenities. After several attempts to induce Briggs to leave, the officers began escorting him from the grounds, and Briggs continued shouting, "Fuck you, motherfucking cops." The area was crowded, and Briggs's behavior noticeably affected carnival patrons.

Briggs continued to shout obscenities outside the grounds, and the officers decided to arrest him for disorderly conduct. They announced that Briggs was under arrest and told him to put his hands against a nearby truck. Briggs asked, "What the fuck is that for? I'm leaving." But the officers told him it was too late, that he was under arrest. Adams grabbed Briggs's arm to handcuff him, but Briggs threw his arms up, striking Adams and knocking Adams's watch off his wrist. The officers tried to put

Briggs on the ground: he had on one handcuff and was fighting violently. Briggs kicked Miles close to the groin, and as Briggs struggled, he continued to yell obscenities and shouted, "you fucked with the wrong person now" and "I'm going to get you." Briggs found a place to hold onto the truck and would not let go. Eventually the officers decided to use mace on Briggs, and this caused him to let go of the truck, but he became more violent.

Adams testified that a large crowd had gathered to watch. Briggs screamed that the police were beating and killing him. Collins went to his police car to get his dog out to use in controlling the gathering because the officers feared that the crowd would try to take Briggs from them.

Eventually, the officers got Briggs into a squad car. As they took him to the Sheriff's office, and once inside the station, he continued yelling. At Briggs's behest, the police called an ambulance crew to check his injuries, but Briggs yelled at them, and rejected their efforts to treat him. He urinated on the heater and carpet in the room where he was held, and had to be restrained in a straight jacket before he could be taken to a hospital for examination. The hospital found no injuries.

Briggs's version of these events differs from those of the officers. He says that he was winning money when the officers asked him to leave. "The only thing I can think, they didn't like I was winning money or it was another mishap in there and they thought I did it." Wishing to avoid trouble, he prepared to leave. As he departed the tent, he indicated his plan to leave and told the officers that he didn't need an escort. "And then when I got to the ... made the left to go outside the fence and I just looked around and there he goes. You know, the guys were on top of me."

Briggs testified that the police threw him to the ground, sprayed mace in his eyes, and beat him with a stick or clubs. The officers handcuffed him while he was on the ground, and by his estimate, he spent five to ten minutes there, with

two or three officers on top of him. Next, the officers put him in a police car and drove him to the station, where they handcuffed him to a stationary object. He stated that he cooperated with the paramedics, but that their equipment malfunctioned. And by Briggs's account, he urinated on the floor because the police ignored his pleas to allow him to go to the bathroom.

## I. THE SUFFICIENCY OF THE EVIDENCE

The State contends that Briggs "has failed to preserve his attack on the sufficiency of the evidence for appellate review." We agree. After the trial judge denied defense counsel's motion for judgment of acquittal, Briggs called two witnesses, rested his case, but failed to renew his motion for judgment of acquittal. Having withdrawn the motion by putting on evidence, he has not preserved for our review the court's denial. *Winkles v. State*, 40 Md.App. 616, 392 A.2d 1173 (1978).

In order to avoid further litigation, we shall address the merits of appellant's arguments. We first address whether the police officers had probable cause to arrest Briggs, because all else follows from that determination. Briggs argues that, at most, the State's evidence demonstrates that he talked loudly and used obscene, offensive language at a neighborhood carnival, and that this did not give the officers probable cause to arrest him.

Briggs was charged with violating Md.Ann.Code art. 27, § 123 (Supp.1991), a statute proscribing disorderly conduct in public places.

(a) A person may not act in a disorderly manner to the disturbance of the public peace, upon any public street, highway, alley, park or parking lot, or in any vehicle that is in or upon any street, highway, alley, park or parking lot, in any city, town, or county in this State, or at any place of public worship, or public resort or amusement in any city, town or county in this State, or in any store during business hours, or in any elevator, lobby or corri-

dor of any office building or apartment house having more than three separate dwelling units, or in any public building in any city, town or county of this State.

We look to the many Maryland cases interpreting this statute to determine whether it sanctions Briggs's behavior. This court in *Reese v. State*, 17 Md.App. 73, 80–81, 299 A.2d 848 (1973) (citations omitted) considered whether the statute applied to a defendant who conversationally used an obscenity in the presence of others who were offended by the language, and who "carried on." We described the conduct proscribed by the section as follows:

[T]he gist of the crime under the statute, as it was in the cases of common law predecessor crimes, is the doing or saying, or both, of that which offends, disturbs, incites, or tends to incite, a number of people gathered in the same area. In other words, it is conduct of such a nature as to affect the peace and quiet of persons actually present who may witness the conduct or hear the language and who may be disturbed or provoked to resentment thereby. Nevertheless, the statute, in either its "doing" or "saying" proscriptions, may not punish acts or spoken words, although vulgar and offensive, which are protected by the first and fourteenth amendments. Implicit in § 123 is the prohibition against a person wilfully acting in a disorderly manner by making loud and unseemly noises or by profanely cursing, swearing or using obscene language. The State has the power to punish obscene expression, but to be obscene such expression must be, in some significant way, erotic, so as to conjure up such psychic stimulation in anyone likely to be confronted with it. And the State is free to ban the simple use, "without a demonstration of additional justifying circumstances, of so-called 'fighting words', those personally abusive epithets which, when addressed to an ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." Thus the obscene language prohibited means obscene in the constitutional sense and the profanely cursing or swearing prohibited means "fighting words."

Whether the loud and unseemly noises prohibitions are within the ambit of protected expression depends on the nature and content of them, a question to be determined on the facts of the particular case.

We also note, as per our decision in *In re Nawrocki*, 15 Md.App. 252, 258, 289. A.2d 846 (1972), that disorderly conduct within the statute's meaning "requires the actual presence of other persons who 'may witness' the conduct or hear the language and who 'may be disturbed or provoked to resentment thereby.'" Also, the carnival unquestionably falls within the meaning of "public resort or amusement." *See Drews v. State*, 224 Md. 186, 191, 167 A.2d 341 (1961) (public resort or amusement includes amusement parks).

For the sake of clarity, we divide the Briggs incident into three phases: the time before the officers arrived at the dicing table during which Briggs cursed loudly and engaged in rough behavior; the period during which the officers arrived, repeatedly attempted to get Briggs to move along, and finally escorted Briggs from the premises as he continued to shout and curse; and the episode outside the carnival grounds during which Briggs loudly and bodily resisted arrest.

With respect to the first episode, we are unable to say that Briggs's language violated the statute's 'saying' prong. Although Briggs repeatedly uttered unspecified obscenities while he was standing in the dicing booth, evaluating whether his language invokes the statute's sanction involves determining if, under the circumstances, his speech was within the ambit of constitutionally protected free expression. Following United States Supreme Court decisions and our own precedent in *Reese*, we conclude that Briggs's speech was constitutionally protected. His language was not obscene in the sense of being erotic so as to conjure up psychic stimulation in anyone likely to be confronted with it. *See Reese*, 17 Md.App. at 80, 81, 167 A.2d 341. Neither did it constitute 'fighting words,' which are words that "have a direct tendency to cause acts of violence by the person to whom, individually, the remark is ad-

dressed." *Id.* at 82, 167 A.2d 341 (quoting *Gooding v. Wilson,* 405 U.S. 518, 523, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972)). Briggs's remarks were not addressed to any particular individual among the firemen or the onlookers, and his mere use of profane language would not plainly tend to excite others to breach the peace. Briggs's remarks inside the dicing tent were constitutionally protected speech, and the evidence was legally insufficient to establish that he violated the statute by means of his speech.

■ But the evidence suggests that Briggs's conduct constituted the 'doing' of that which might offend, disturb, incite, or tend to incite, other people in the area. Briggs shouted, grabbed back the money he lost, and slammed the dice into the table. The carnival was crowded, and some of the patrons were noticeably affected by this: people complained to the firemen, asking them to do something to induce Briggs to desist. So extreme was Briggs's behavior that the firemen operating the dicing game were moved to seek police assistance in persuading him to leave after their own attempts to discourage his disruptive behavior were unsuccessful. This alone would be sufficient to invoke the statute's sanctions.

■ Moving to the incident's second phase, in which the police approached Briggs and asked him to leave the premises, we first examine whether Briggs's actions were disorderly. The evidence shows that the officers repeatedly attempted to induce Briggs to move on, and his refusal to do so may constitute disorderly behavior: "refusal to obey a proper order of an officer may constitute an offense justifying an arrest, particularly where there is profanity in the presence of others that may justify a breach of the peace." *Sharpe v. State,* 231 Md. 401, 404, 190 A.2d 628 *cert. denied,* 375 U.S. 946, 84 S.Ct. 350, 11 L.Ed.2d 275 (1963).[1] *See also Drews v. State,* 224 Md. 186, 192, 167

---

1. The court in *Sharpe* did not reach the question whether the defendant's actions and language constituted disorderly conduct because

A.2d 341 (1961) ("it has been held that failure to obey a policeman's command to move on when not to do so may endanger the public peace, amounts to disorderly conduct."). In light of the circumstances, Briggs's actions were disorderly once again. The officers told Briggs to leave because his conduct was disruptive to other carnival patrons, some of whom were sufficiently offended by it to complain about it to the firemen: his conduct endangered the public peace. In this context, the officers' instructions to Briggs telling him to move along were reasonable, and his failure to obey them constituted disorderly conduct.

Whether Briggs's use of profanity towards the officers is constitutionally protected is another matter: as we have discussed, *supra,* his words were not obscene in the constitutional sense. But they were abusive epithets, directed at particular individuals, and they might have tended to incite disorderly conduct in others.

▮▮▮▮ We note at the outset that if the officers unlawfully demanded that Briggs depart, his language would be constitutionally protected. The case *Diehl v. State,* 294 Md. 466, 451 A.2d 115 (1982), is instructive on this matter, because it addresses analogous issues with respect to a similar disorderly conduct statute, Md.Ann.Code art. 27, § 121, proscribing loud and unseemly noises, and the use of obscene language.[2] In *Diehl,* the Court of Appeals considered whether a police officer could arrest someone for saying, "Fuck you, [Officer]." The court described the development of case law identifying allowable government regulation of speech: fighting words are not constitutionally protected because their "slight social value as a step to truth ... is clearly outweighed by the social interest in order and morality." *Id.* at 474, 451 A.2d 115 (quoting *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766,

---

the officer had other grounds for probable cause to arrest the defendant.

**2.** Briggs relies upon this case in his appeal.

86 L.Ed. 1031 (1942) ). The *Diehl* court asserted that *Chaplinsky* "may be interpreted as holding that fighting words would produce an uncontrollable impulse to violence...." *Id.* [294 Md.] at 474–75, 451 A.2d 115. Nevertheless, the Supreme Court has limited the doctrine by recognizing that "the use of an offensive expletive does not, by itself, deprive speech of protection." *Id.* at 475, 451 A.2d 115. A court must examine the context in which the words were uttered. In *Diehl*, the defendant addressed the offensive words directly to the police officer, but the court determined that the words were not "a personally abusive epithet hurled to invoke immediate and violent response." Moreover, the court found that "Diehl's use of vulgar language does not evolve into a crime simply because persons in the area stopped, looked, and listened." *Id.* The court concluded that "where, as here, a person is acting in a lawful manner (a passenger getting out of a stopped car) and is the object of an unlawful police order, it is not usually a criminal violation for such person to verbally protest a police officer's insistence upon submission to such an order." *Id.*

We distinguish *Diehl* and the case at bar, however, by pointing out that the defendant in *Diehl* behaved lawfully. In the instant case, Briggs did not act in a lawful manner: the police officers had probable cause to arrest him for disorderly conduct. That they had not yet done that bespeaks their restraint, and does not reflect upon their legal ability to do so. *See also Harris v. State,* 237 Md. 299, 303, 206 A.2d 254 (1965) ("A failure to obey a reasonable and lawful request by a police officer fairly made to prevent a disturbance to the public peace constitutes disorderly conduct.").

Because police officers are (theoretically) non-inciteable, the content of Briggs's language at this point was insufficient to give the officers probable cause, even though Briggs was saying, "fuck you, cops" and "[f]uck you, motherfucking cops," and continued shouting obscenities as the officers escorted him from the carnival. Indeed, these

comments were directed in particular to the officers and were of the sort that might have a direct tendency to provoke violence from the person to whom the remark was addressed. But that is not the end of the analysis. As the Court of Appeals pointed out in *Downs v. State*, 278 Md. 610, 615, 366 A.2d 41 (1976), " 'fighting words' have been recognized as having some social value and are punishable now not on a 'per se' basis but only when there is a likelihood of imminent disturbance." None of the evidence suggests, however, that the officers were aroused by his language, and one officer testified, in reply to a query as to whether Briggs's foul language induced them to arrest him, that "[h]e can't disturb my peace by law." *See Downs* at 618–19, 366 A.2d 41 (court declined to consider profane remark possibly addressed to police officer where the remark did not arouse the officer); *see also Lewis v. City of New Orleans*, 408 U.S. 913, 92 S.Ct. 2499, 33 L.Ed.2d 321 (1972) (remanding case in which defendant called police "God damned mother fuckers;" Powell, J., concurring, would have considered the words fighting words had they been addressed to one other than a police officer, trained to exercise restraint).

Finally, we turn to the last episode of this unfortunate incident, in which Briggs protested his arrest with continued vulgar language, threats, and physical resistance.

As we recently indicated in *Barnhard v. State*, 86 Md. App. 518, 527, 587 A.2d 561 (1991), *cert. granted*, 323 Md. 115, 591 A.2d 506 (1991), there is no question that in Maryland, a person illegally arrested may use any reasonable means, including reasonable force, to escape. But we qualified this by indicating that "even if the initial stop of [an] appellant was illegal, his subsequent actions must still be examined to determine whether that conduct justified an arrest." *Id.* [86 Md.App.] at 528, 587 A.2d 561 (citing *Diehl, supra* [294 Md.] at 478–79, 451 A.2d 115, in which the court examined the defendant's response to an officer's illegal command to determine whether the subsequent conduct justified an arrest).

■ Assuming, arguendo, that the police officers unlawfully demanded that Briggs leave, his response to their order constituted disorderly conduct: in addition to physically resisting their efforts to take him into custody, he threatened them, and incited the crowd sufficiently to cause the officers to fear that the crowd would 'take him away' from them. Indeed, this fear prompted one officer to divert his attention from Briggs in order to use his dog to regain control of the crowd.

The standard of review in deciding an allegation concerning the sufficiency of evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

■ Employing this standard, we conclude that a rational jury reasonably could have concluded that Briggs was guilty of disorderly conduct. Briggs's actions at every turn disrupted the carnival, challenged the police, and eventually incited the crowd against the officers. This behavior reasonably prompted the officers to arrest him for disorderly conduct. Because the officers had probable cause to arrest Briggs, his arrest was lawful, and he was not entitled to resist them. Fighting with the officers therefore constituted battery upon them, and resisting arrest. We hold that the evidence was sufficient to support Briggs's conviction on all counts, and therefore affirm.

## II.  THE JURY INSTRUCTIONS

■ Briggs also argues that the trial court committed reversible error when it refused his attorney's request to instruct the jury on self-defense. The evidence must support a court's giving advisory instructions, and Briggs contends that the testimony of the State's witnesses, the defense witnesses, and the circumstances of his arrest

generate the requisite support.[3]   He therefore requests that we reverse the trial court's finding.

We disagree.  The Court of Appeals in *Dykes v. State*, 319 Md. 206, 216, 571 A.2d 1251 (1990) explained that a homicide defendant has the initial burden of producing "some evidence" on the issue of self-defense as a predicate to the judge's issuing a jury instruction on that issue.  The court explained that

> *Some evidence* is not strictured by the test of a specific standard.  It calls for no more than what it says— "some," as that word is understood in common, everyday usage.  It need not rise to the level of "beyond reasonable doubt" or "clear and convincing" or "preponderance."  The source of the evidence is immaterial; it may emanate solely from the defendant.  It is of no matter that the self-defense claim is overwhelmed by evidence to the contrary.  If there is any evidence relied on by the defendant which, if believed, would support his claim that he acted in self-defense, the defendant has met his burden.  Then the baton is passed to the State.  It must shoulder the burden of proving beyond a reasonable doubt to the satisfaction of the jury that the defendant did not kill in self-defense.

*Dykes*, 319 Md. at 216–17, 571 A.2d 1251.

■ We note that the trial court refused to give the instruction on the ground that Briggs's defense was not that he assaulted the officers and was justified in doing so, but that he did not assault them at all.  Briggs's account supports the judge's decision: Briggs testified that he was leaving the carnival grounds, got outside the fence and was thrown to the ground, whereupon the officers sprayed him with mace, handcuffed him, and took him away.

---

**3.** Briggs at first alleges that the State's witnesses generated evidence sufficient to warrant a jury instruction, but at the close of his argument contends that circumstances and his own witnesses also support an instruction.

Although Briggs argues that he was entitled to the instruction, he does not support this with evidence, and we see nothing in the record that would give rise to a claim of self-defense. Accordingly, we affirm the trial court.

JUDGMENTS AFFIRMED; APPELLANT TO PAY THE COSTS.