732 A.2d 367

**Pamela DZIEKONSKI**

v.

**STATE of Maryland.**

**No. 1105, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

July 2, 1999.

Daniel H. Weiss, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Argued before HARRELL, THIEME, and JAMES S. GETTY (Ret'd, Specially Assigned), JJ.

THIEME, Judge.

Appellant, Pamela Dziekonski, was charged with assault in the second degree and disorderly conduct. A jury sitting in the Circuit Court for Montgomery County found her guilty of disorderly conduct and the court imposed a generally suspended sentence. Appellant noted a timely appeal and presents three questions for our review:

I. Did the trial court err in its instructions to the jury?

II. Did the trial court admit prejudicial and irrelevant evidence?

III. Was the evidence sufficient to sustain appellant's conviction?

We answer appellant's first question in the affirmative and reverse and remand her case for a new trial. We need not reach appellant's second question as it is unlikely to recur on re-trial. Ordinarily, this Court would address appellant's third question because re-trial is not permitted if the evidence was insufficient. *Mackall v. State,* 283 Md. 100, 113–14, 387 A.2d 762 (1978). In the present case, however, that question is not properly preserved for our review.

## FACTS

During the late evening hours of March 3 and early morning hours of March 4, 1998, appellant and her husband were in the bar area of the Village Cafe, which is located in Gaithersburg.

At trial, Brenda Reed, the bartender, testified that she had served appellant five or six beers and two or three "shooters." After another couple entered the cafe, an argument arose between them and the Dziekonskis. The argument became "very, very loud" and Ms. Reed asked the other couple to leave. According to Ms. Reed, appellant "went after the couple" as they were leaving and tried to kick the man. Ms. Reed restrained appellant, but observed appellant's husband leave the bar through another door. Ms. Reed then called the police and, within fifteen minutes, approximately six officers responded to the bar. In the meantime, appellant's husband re-entered the bar and went into the bathroom.

Police Officers William Thomas and Steven Phelps were among the officers who responded to the Village Cafe. Officer Phelps remained outside with the assault victim. Officer Thomas went into the bar and found appellant's husband in the bathroom. Officer Thomas escorted appellant's husband into the restaurant area and had him sit down. The officer explained that the restaurant was a separate area, but was in "clear view" of the bar. After her husband was seated, appellant approached the officer and related her version of the dispute. Officer Thomas testified that appellant was calm and spoke in a normal tone of voice, but she appeared to be "highly intoxicated." When Officer Thomas placed appellant's husband under arrest for first degree assault and put him in handcuffs, appellant yelled, "This is bullshit, he didn't fucking do anything. . . ."

Officer Phelps was then in the restaurant and spoke to appellant, telling her to calm down, keep her mouth shut, and stop yelling. Officer Phelps also told appellant that if she did not quiet down she would be arrested. The officer testified that appellant was in close proximity to Officer Thomas, "was extremely loud, yelling and belligerent, seemed to be interfering with Officer Thomas' ability to handle the suspect and make his arrest there and make his search." Officer Phelps told appellant that she needed to quiet down and appellant responded, "[W]hy are you locking up my fucking husband?" and, "[T]his is bullshit, you're locking up the wrong guy."

According to Officer Thomas, appellant kept yelling, "If you're going to arrest him, you're going to have to arrest me, too." Officer Phelps testified that ten to fifteen bar patrons "were milling around looking at this scene, looking at us and looking at her." Appellant continued to yell and scream and Officer Phelps told her to calm down, but when she said, "I want to go with my fucking husband," he told her she was under arrest for disorderly conduct. Officers Thomas and Phelps testified that, as Phelps moved toward appellant to place her in handcuffs, she hit him in the chest with her fist. Officer Phelps and a third officer pushed appellant against the wall and handcuffed her. Appellant was transported to the Central Processing Unit and then taken to the hospital, where she was examined for an injury to her head that was sustained when the officers pushed her against the wall.

Appellant testified in her own defense that she was trying to tell the officers that her husband had a leg injury,[1] that he had been defending himself, and that they were taking the wrong person to jail. She stated that Officer Thomas was "very nice" and had told her where the police were taking her husband. Appellant testified that she was "loud" and "upset" and that Officer Phelps came toward her, told her to shut her mouth, and then arrested her. Another officer came to assist Phelps and one of them beat her head against the wall.

## DISCUSSION

### I.

The trial court instructed the jury on the offense of disorderly conduct, stating:

The first charge is disorderly conduct and the second charge is assault in the second degree. So let me tell you about disorderly conduct.

This is in the nature of a definition of disorderly conduct. A person [may] not act in a disorderly manner to the

---

1. Evidence was presented that appellant's husband walked with a cane.

disturbance of the public peace in any public resort or amusement in any county in this State. The gist of the crime of disorderly conduct is the doing or saying or both of that which offends, disturbs, incites, or tends to incite a number of people gathered in the same area.

Disorderly conduct is conduct of such a nature as to affect the peace and quiet of persons who may witness the same and who may be disturbed or provoked to resentment thereby. Disorderly conduct is conduct of such nature as to affect the peace and quiet of persons actually present who may witness the conduct or hear the language and who may be disturbed or provoked to resentment thereby.

Disorderly conduct required the actual presence of other persons who may witness the conduct and hear the language and who may be disturbed or provoked to resentment thereby. Refusal to obey a proper order of an officer may constitute an offense justifying an arrest, particularly where there is profanity in the presence of others that may threaten a breach of the peace.

Defense counsel objected to this instruction and argued:

Your Honor, I have filed with the Court a requested jury instruction regarding disorderly conduct. Now, first I would like to say that the Court needs to tell them that the Defendant must have acted willfully.

Willfully is an element of this offense, that she willfully acted in a disorderly manner and that her purpose was to disturb the public peace. I would also ask that the Court tell them that acting in a disorderly manner can be doing or saying, as the Court said.

However, if the disorderly conduct is based on saying something, the First Amendment severely limits what the language—what language may be considered disorderly. The constitution protects a person's right to say anything not willfully said for the purpose of disturbing the public peace, and not obscene.

"Obscene" has been defined as highly erotic and not fighting words, words that have been defined as words that

provoke—an act of violence and start of a riot—even when directed to the police are protected by the First Amendment.

Protected speech may not form the basis for a charge of disorderly conduct. If the speech used by the Defendant are protected [sic], the jury must find the defendant not guilty.

The written instruction filed with the court provided:

In order to convict the Defendant of the crime of Disorderly Conduct, the State must prove each element beyond a reasonable doubt. The four elements of Disorderly Conduct are:

1. The Defendant willfully acted in a disorderly manner to the disturbance of the public peace;

2. The Defendant did so in the actual presence of other persons;

3. Those other persons were disturbed or provoked to resentment; and

4. The Defendant did act disorderly in a public resort or amusement, a store during business hours or in any public building.

Acting in a disorderly manner has been defined as the doing, or saying, or both, of that which offends, disturbs, incites, or tends to incite, a number of people gathered in the same area. However, if the disorderly conduct is based on saying something (rather than doing something), the First Amendment severely limits what language may be considered disorderly. The Constitution protects a person's right to say anything, not willfully said for the purpose of disturbing the public peace, *and* not obscene (highly erotic) or fighting words (words that provoke an average listener to an act of violence or to start a riot). Curses, even when directed to the police, are protected by the First Amendment. Protected speech may not form the basis for a charge of disorderly conduct. If the speech used by the

Defendant was protected, you must find her not guilty. [Emphasis in original.]

The trial court declined to give the requested instruction.

Appellant contends that the court erred in failing to instruct the jury that her conduct had to be willful and that her speech may be protected. We address these arguments separately, but first set forth the trial court's duty to give jury instructions requested by a party in a criminal case.

Maryland Rule 4–325(c) provides:

The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

In accordance with this Rule, "a trial judge must give a requested instruction that correctly states the applicable law and that has not been fairly covered by the instructions actually given." *Mack v. State,* 300 Md. 583, 592, 479 A.2d 1344 (1984). To merit an instruction, however, "the issue as to which the request is made must have been generated by the evidence adduced." *State v. Martin,* 329 Md. 351, 357, 619 A.2d 992, *cert. denied,* 510 U.S. 855, 114 S.Ct. 161, 126 L.Ed.2d 122 (1993). *See also Hof v. State,* 337 Md. 581, 612, 655 A.2d 370 (1995) (Rule 4–325(c) "has been interpreted to require that a requested instruction be given only when there is evidence in the record to support it."); *Davis v. State,* 104 Md.App. 290, 293, 656 A.2d 326 (1995) ("It is incumbent upon the trial court, on request in a criminal case, to give an advisory instruction on every point of law essential to the crime charged and supported by evidence.").

### Did the trial court err in declining to instruct the jury that appellant's conduct had to be willful?

Appellant first claims that the crime of disorderly conduct includes an element of willfulness and that omitting this

element would turn the crime into a strict liability offense. She stresses that such offenses are disfavored. Appellant contends that, by failing to instruct the jury that she must have willfully engaged in the disorderly conduct, the trial court omitted an essential element of the offense. In light of such an omission, she argues, the jury could have easily reached the erroneous conclusion that by speaking loudly and using vulgar language in her conversation with the police officers, although she possessed no intention to affect the other patrons, she was necessarily guilty of disorderly conduct.

Appellant was convicted of disorderly conduct under Md. Code (1957, 1996 Repl.Vol.), Art. 27, § 123,[2] which provides, in relevant part:

> (a) *Prohibited conduct.*—A person may not act in a disorderly manner to the disturbance of the public peace, upon any public street, highway, alley, park or parking lot, or in any vehicle that is in or upon any street, highway, alley, park or parking lot, in any city, town, or county in this State, or at any place of public worship, or public resort or amusement in any city, town or county in this State, or in any store during business hours, or in any elevator, lobby or corridor of any office building or apartment house having more than three separate dwelling units, or in any public building in any city, town or county of this State.

In *Reese v. State,* 17 Md.App. 73, 299 A.2d 848 (1973), this Court determined that under § 123, the actor's conduct must be willful:

> [T]he gist of the crime under the statute, as it was in the cases of common law predecessor crimes, is the doing or saying, or both, of that which offends, disturbs, incites, or tends to incite, a number of people gathered in the same area. In other words, it is conduct of such a nature as to

---

2. Article 27, § 123 was repealed effective October 1, 1998. Disorderly conduct is now addressed under Art. 27, § 121(b)(2), which provides: "A person may not willfully act in a disorderly manner to the disturbance of the public peace."

affect the peace and quiet of persons actually present who may witness the conduct or hear the language and who may be disturbed or provoked to resentment thereby. . . . *Implicit in § 123 is the prohibition against a person wilfully acting in a disorderly manner* by making loud and unseemly noises or by profanely cursing, swearing or using obscene language.

17 Md.App. at 80, 299 A.2d 848 (emphasis added).

In light of our decision in *Reese,* we conclude that the trial court erred in declining to instruct the jury that appellant had to engage willfully in the conduct at issue. Appellant is incorrect, however, that she had to act for the purpose of disturbing the public peace. The effect of the actor's conduct need only be that the peace was disturbed. To include the requirement that she must have acted for the purpose of disturbing the peace would add an element not within the plain language of the statute. *See Amalgamated Casualty Ins. Co. v. Helms,* 239 Md. 529, 534–35, 212 A.2d 311 (1965) ("To supply omissions [in a statute] transcends the judicial function."). In sum, the trial court erred in declining to instruct the jury that appellant's conduct had to be willful, but correctly declined to instruct that appellant had to act for the purpose of disturbing the public peace.

### Did the trial court err in declining to instruct the jury that protected speech cannot form the basis of a disorderly conduct conviction?

Appellant further claims that the court should have instructed the jury that uttering vulgar phrases that are neither obscene nor "fighting words" does not constitute disorderly conduct. Appellant contends that the phrases she used were not erotic and were not "fighting words," but were terms that have found their way into the colloquial vocabulary. She argues that a defense of protected speech was generated and that the trial court should have so instructed the jury.

We begin by examining Art. 27, § 123 and the limits placed upon its scope by the guarantees of free speech contained in

the First and Fourteenth Amendments. We again turn to *Reese*, where this Court explained that Section 123,

> in either its "doing" or "saying" proscriptions, may not punish acts or spoken words, although vulgar and offensive, which are protected by the first and fourteenth amendments.... The State has the power to punish obscene expression, but to be obscene such expression must be, in some significant way, erotic, so as to conjure up such psychic stimulation in anyone likely to be confronted with it. And the State is free to ban the simple use, "without a demonstration of additional justifying circumstances, of so-called 'fighting words', those personally abusive epithets which, when addressed to an ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031. Thus the obscene language prohibited means obscene in the constitutional sense and the profanely cursing or swearing prohibited means "fighting words." Whether the loud and unseemly noises prohibitions are within the ambit of protected expression depends on the nature and content of them, a question to be determined on the facts of the particular case.

*Reese,* 17 Md.App. at 80–81, 299 A.2d 848 (some citations omitted).

The Court of Appeals in *Downs v. State,* 278 Md. 610, 615, 366 A.2d 41 (1976), *cert. denied,* 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977) noted:

> The first limitation on the "fighting" words doctrine occurred in *Cohen v. California,* 403 U.S. 15, [91 S.Ct. 1780, 29 L.Ed.2d 284], (1971), where the Court reversed Cohen's conviction for "maliciously and willfully disturb(ing) the peace or quiet of any neighborhood or person ... by ... offensive conduct" by wearing into the Los Angeles Courthouse a jacket bearing the words "Fuck the Draft." The Court described "fighting" words as "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." 403 U.S. at 20, [91 S.Ct. 1780].

It assumed that the words must be "directed to the person of the hearer." *Id.* The slogan on Cohen's jacket did not fall into that category because it was not directed to anyone in particular and there was no evidence that anyone who saw it was aroused. The Court went on to defend Cohen's use of the admittedly vulgar word "fuck." It refused to allow the State the right "to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us" because it concluded that "one man's vulgarity is another's lyric." 403 U.S. at 25[, 91 S.Ct. 1780]. By these words, the Supreme Court has made it difficult to find any curse words *inherently* provocative.

 In *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972), the Supreme Court defined "fighting words" as those that " 'have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed.' " *Id.* at 524, 92 S.Ct. 1103 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)).[3] "Fighting words" have, thus, been "recognized as having some social value and are punishable now not on a 'per se' basis but only when there is a likelihood of imminent disturbance." *Downs v. State*, at 615, 366 A.2d 41 (1976). Accordingly, "the use of an offensive expletive does not, by itself, deprive speech of protection." *Diehl v. State*, 294 Md. 466, 475, 451 A.2d 115 (1982), *cert. denied*, 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 363 (1983). *See also Downs*, 278 Md. at 615, 366 A.2d 41 (emphasis in original) (by its holding in *Cohen*, "the Supreme Court has made it difficult to find any

---

**3.** Although the Supreme Court quoted from its earlier decision in *Chaplinsky*, which appears to make no change to the standard set forth in that case, in *Downs v. State*, 278 Md. 610, 366 A.2d 41 (1976), the Court of Appeals noted that *Chaplinsky* contained a somewhat inconsistent definition of "fighting words." *Id.* at 614, 366 A.2d 41. Chief Judge Robert C. Murphy, now retired, explained that the Supreme Court referred to one test involving the individual to whom the words are addressed and another test where the response of the average addressee is considered. *Id.* It was in *Gooding*, Chief Judge Murphy pointed out, that the Court clearly adopted the test where the individual to whom the words are addressed is considered. *Id.* at 614–15, 366 A.2d 41.

curse words *inherently* provocative"); *Matter of Nawrocki,* 15 Md.App. 252, 265, 289 A.2d 846 (1972) ("profanity *per se* would not amount to disorderly conduct"). The emphasis is to be placed upon the context in which the words are uttered as opposed to the words themselves. *Diehl,* 294 Md. at 475, 451 A.2d 115; *Briggs v. State,* 90 Md.App. 60, 70, 599 A.2d 1221 (1992).

█ Neither is obscene language protected. For language to be obscene, it "must be, in some significant way, erotic." *Cohen,* 403 U.S. at 20, 91 S.Ct. 1780. "The term erotic denotes a tendency to excite sexual desire, not to provoke violence." *Diehl,* 294 Md. at 474, 451 A.2d 115.

█ As detailed above, appellant may not be punished if her speech was protected by the First and Fourteenth Amendments; therefore, the nature of her words was at issue in the trial. It was for the jury to decide whether her words were obscene or constituted "fighting words." Accordingly, we hold that the trial court erred in declining to instruct the jury that speech protected by the First and Fourteenth Amendments may not form the basis of a disorderly conduct conviction.

The State claims that the court's failure to instruct the jury on protected speech was harmless error because the State's Attorney stressed appellant's conduct rather than her speech to support the conviction. The State refers us to closing argument where, it alleges, the State's Attorney emphasized appellant's actions prior to the arrival of the police and her actions in failing to heed Officer Phelps's orders to calm down and be quiet. The State concedes that the State's Attorney did mention that appellant was cursing, but argues that she did so merely to impress upon the jury that appellant was the aggressor.

█ The Court of Appeals has held that there is a " 'police command' aspect of disorderly conduct." *Dennis v. State,* 342 Md. 196, 201, 674 A.2d 928 (1996). A " 'failure to obey a policeman's command to move on when not to do so may

endanger the public peace, amounts to disorderly conduct.'" *Id.* (quoting *Drews v. State,* 224 Md. 186, 192, 167 A.2d 341 (1961), *vacated on other grounds and remanded,* 378 U.S. 547, 84 S.Ct. 1900, 12 L.Ed.2d 1032 (1964), *judgments reinstated and reaffirmed,* 236 Md. 349, 204 A.2d 64 (1964), *appeal dismissed and cert. denied,* 381 U.S. 421, 85 S.Ct. 1576, 14 L.Ed.2d 693 (1965)). *See also Harris v. State,* 237 Md. 299, 303, 206 A.2d 254 (1965) ("A failure to obey a reasonable and lawful request by a police officer fairly made to prevent a disturbance to the public peace constitutes disorderly conduct."). In addition, appellant makes no argument that her conduct was protected.

In closing argument, the State's Attorney referred to several instances of appellant's conduct, which she contended would amount to disorderly conduct. In its instructions to the jury, however, the trial court drew no distinction between appellant's conduct and speech. As a result, we have no knowledge as to the basis upon which the jury convicted appellant of disorderly conduct. Under these circumstances, we are unable to conclude that the error was harmless beyond a reasonable doubt, and we reverse and remand appellant's case for a new trial.

Finally, we do not endorse the instruction requested by appellant as it was not a correct statement of the law in every detail. "Fighting words" do not have to lead to a riot, and curses must be considered in the context in which they are uttered. *Diehl,* 294 Md. at 475, 451 A.2d 115; *Briggs,* 90 Md.App. at 70, 599 A.2d 1221. In addition, the State may proscribe more than fighting words and obscenity. *See, e.g., Brandenburg v. Ohio,* 395 U.S. 444, 448, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam) (State may proscribe advocacy of the use of force or violation of law "where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action"). Nonetheless, appellant's request for an instruction on protected speech was sufficient to trigger the dictates of Rule 4–325(c). The trial court erred in declining to so instruct the jury.

## II.

Prior to trial, defense counsel moved to suppress any statements appellant made after her arrest. On the morning of trial, the State's Attorney indicated that she intended to use a post-arrest statement at trial. Defense counsel informed the court that she had no notice of that statement. When the State's Attorney was unable to locate a police officer for the hearing on the motion to suppress, she informed the court that she would not use any post-arrest statements made by appellant.

During trial, Officer Thomas testified on direct examination without mentioning any post-arrest statements made by appellant. On cross-examination, defense counsel inquired into the officer's police report. On redirect examination, the State moved to have Officer Thomas's report admitted into evidence. The court sustained defense counsel's objection, but ruled that counsel had opened the door to everything Officer Thomas had written about appellant. The State's Attorney then inquired: "You wrote in your report, 'Pamela Dziekonski continued to yell and scream and use racial slurs while yelling at Officer Moon....'" [4] Defense counsel objected, contending that it was a leading question and the court overruled the objection. Officer Thomas also testified that he did not hear appellant yell the racial slurs, but that he included them in the report as Officer Phelps had told him what had happened.

On cross-examination, defense counsel further inquired into the racial slurs made by appellant and Officer Thomas testified that appellant uttered the remarks while she was being transported to the Central Processing Unit. Defense counsel concluded cross-examination and then moved to strike the testimony regarding the racial slurs. Counsel argued that the State's Attorney had indicated that she would not present any post-arrest statements made by appellant and that the statements were irrelevant, would inflame the jury, and were

---

4. Officer Thomas testified that Officer Moon is of Asian descent.

highly prejudicial to appellant. The court denied the motion without comment.

At the end of trial, defense counsel asked the trial court to reconsider its ruling on the motion to strike. The court declined to reverse its decision as it believed that the evidence was relevant, "because it tends to support the police officers' testimony of her behavior at the scene, her being drunk, her being out of control, that kind of thing."

Appellant contends that the trial court erred in admitting the evidence that appellant had made racial slurs to Officer Moon. Appellant first claims that this evidence should have been excluded because the State failed to disclose it as required by Md. Rule 4–262(a)(2). Appellant also claims that the State unfairly blind-sided the defense by first representing that it would not elicit any post-arrest statements and then questioning Officer Thomas as to the statement. Appellant argues that the admissibility of this statement was never litigated, that the statement was highly prejudicial, and that it was irrelevant to the charges against her.

 Appellant now has full knowledge of the statement she is alleged to have made after her arrest. Accordingly, we need not reach this question as it is unlikely to recur at retrial.

### III.

Appellant next contends that the evidence was insufficient to sustain her conviction. She argues that there was no evidence that her conduct disturbed anyone other than the police. As to her speech, appellant contends that her utterances did not constitute "fighting words" and were not obscene. As a result, she claims, they were protected by the First and Fourteenth Amendments and cannot be the basis of a conviction for disorderly conduct.

 At the close of the State's case, appellant moved for judgment of acquittal; however, she failed to do so at the close of all the evidence. Under these circumstances, the sufficien-

cy of the evidence is not preserved for appellate review. *See Dumornay v. State,* 106 Md.App. 361, 375, 664 A.2d 469 (1995) (appellant failed to move for judgment of acquittal at close of all the evidence; therefore, issue of sufficiency of the evidence not properly before appellate court); *Briggs,* 90 Md.App. at 66, 599 A.2d 1221 (failure to renew motion for judgment of acquittal at close of defense case waives claim of legal insufficiency).

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR A NEW TRIAL.**

**COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–HALF BY MONTGOMERY COUNTY.**